**John and Mary GAYDOS, Plaintiffs,**

v.

**HUNTINGTON NATIONAL BANK, Defendant.**

No. 3:96CV7375.

United States District Court,
N.D. Ohio,
Western Division.

Oct. 18, 1996.

Rosen, Chicago, IL, and Alicia W. McKay, Law Offices of Alicia W. McKay, Fostoria, OH, for plaintiffs.

H. Grant Stephenson and Daniel W. Costello, Porter, Wright, Morris & Arthur, Columbus, OH, for defendant.

## ORDER

CARR, District Judge.

This is a truth-in-lending case in which plaintiffs allege that Huntington National Bank violated various disclosure requirements of the Consumer Leasing Act (CLA), 15 U.S.C. § 1667a, Ohio Uniform Commercial Code, O.R.C. § 1309.18, and Ohio Consumer Sales Practices Act, O.R.C. § 1345.03. This Court has jurisdiction over the federal claim pursuant to 28 U.S.C. §§ 1331 and 1337. Pending is defendant's Rule 12(b)(6) motion to dismiss for failure to state a claim on which relief can be granted. (Doc. 6). For the following reasons, defendant's motion shall be granted as to the federal claim and the state law claims shall also be dismissed for want of diversity jurisdiction without prejudice.

Plaintiffs John and Mary Gaydos, residents of Sandusky, Ohio, entered into a "Closed–End Vehicle Lease" with defendant Huntington on December 23, 1995. *See* Attachment A. The combination lease/disclosure agreement is a "two-party" lease, wherein Huntington is the lessor and the Gaydos' are the lessees; the boilerplate agreement creates a direct lessor-lessee relationship between defendant and plaintiffs. Among other terms, the lease detailed a schedule of early termination charges and offered an option to purchase a Dodge Grand Caravan for $14,857.90 at the end of the 48-month lease term. Most importantly for purposes of this lawsuit, the lease agreement—under the heading "initial charges"—required the Gaydos' to pay a $425 "refundable security deposit." Other than a promise to return the security deposit,[1] the lease does not further discuss, describe, define, or mention the "refundable security deposit."

John Timothy Murray, Sr., Sylvia Margo Antalis, Murray & Murray, Sandusky, OH, Philip S. Wolin, Charles J. Mack, Wolin &

1. The lease at ¶ 21(e) states: "Subject to our right of setoff (defined at ¶ 41), if any, we will pay you (or credit to sums you owe) your security deposit and any mileage credit."

Plaintiffs, who bring this action on behalf of a class, signed the lease agreement and paid the $425 security deposit. Plaintiffs now allege that defendant "commingled" the security deposit with other funds, "had use" of the security deposit throughout the term of the lease, and "utilized the security deposit in such a manner so as to increase the value of the money through accrued interest and/or other investment." (Doc. 1 at ¶¶ 14–15). The gravamen of plaintiffs' complaint is that the defendant used the plaintiffs' security deposit to earn a profit without accounting for such profits, remitting the profits to plaintiffs, or, applying the profits to reduce the financial obligations of the lease. For purposes of this Rule 12(b)(6) motion, I must presume these facts are true. *See Meador v. Cabinet for Human Resources*, 902 F.2d 474, 475 (6th Cir.).

The lease agreement does not disclose what defendant will do with the security deposit or any profits that may be gained from the bank's possession and use of the deposit. The failure of the lease to disclose how the defendant will allocate—or not allocate—the economic benefit gained from plaintiffs' deposit gives rise to this suit. Plaintiffs contend that defendant had a legal duty to disclose its practice of earning and retaining a profit from plaintiffs' deposit. By failing to make such disclosures, the bank, plaintiffs claim, violated the CLA.

Defendant, in response to the allegation, claims full compliance with all CLA disclosure requirements. Defendant also asserts that, in any event, the CLA does not require disclosure of how it intended to use any profit earned as a result of its possession of the security deposit. Claiming compliance with all federal requirements, defendant argues that plaintiffs fail to state a CLA claim on which relief can be granted. Because I agree that the CLA does not require defen-

dant to disclose how it will treat economic profit derived from the possession or use of plaintiffs' deposit, defendant's Rule 12(b)(6) motion shall be granted.

Passed by Congress as an amendment to the Truth In Lending Act (TILA), 15 U.S.C. §§ 1601 *et seq.*, the CLA purports "to assure a meaningful disclosure" of personal property lease terms to "enable the lessee to compare more readily the various lease terms available to him [and] limit balloon payments in consumer leasing." 15 U.S.C. § 1601(b). Section 1667a of the CLA requires the lessor to provide the lessee with certain information at the consummation of the lease. A lessor who fails to comply with the disclosure requirements of § 1667a is liable to the lessee for damages.[2]

Section 1667a "imposes no substantive requirements of lease terms ... [i]nstead it merely requires adequate disclosure of lease terms." *Wesley v. General Motors Acceptance Corp.*, 1992 WL 281325 at *2 (N.D.Ill.1992). The dispositive question presented by this case is one of scope: whether the CLA requires defendant to disclose its practice of holding plaintiffs' deposit and retaining any profits thereby earned. Asked otherwise: do the CLA disclosure requirements apply to Huntington's retention of profits earned from plaintiffs' deposits? The dispositive issue is *not* whether the law permits Huntington to retain profits earned from the Gaydos' deposit, but rather, when Huntington earns such profits, whether the CLA requires Huntington to disclose its practice of keeping those profits. For federal court purposes, resolution of this case revolves around the need, or lack thereof, to disclose information without regard to the lawfulness of the practice under state law.

Plaintiffs contend that three specific provisions of the CLA, §§ 1667a(4), (5), and (8),

---

2. The CLA incorporates many provisions of the TILA, including the civil liability damage provisions. 15 U.S.C. § 1667d(a) ("Any lessor who fails to comply with any requirement imposed under section 1667a or 1667b of this title ... is liable ... as provided in section 1640 of this title"). Section 1640 explains the civil damage provisions for violations of the TILA. Courts, in strictly construing the TILA, traditionally find liability for even the slightest failure to disclose

the information required by statute. *See In re Porter*, 961 F.2d 1066, 1078 (3rd Cir.1992); *Semar v. Platte Valley Fed Sav. and Loan Assoc.*, 791 F.2d 699, 704 (9th Cir.1986); *Mars v. Spartanburg Chrysler Plymouth, Inc.*, 713 F.2d 65, 67 (4th Cir.1983); *Jackson v. Grant*, 890 F.2d 118, 121–122 (5th Cir.1983); *Bizier v. Globe Fin. Serv., Inc.*, 654 F.2d 1, 3 (1st Cir.1981). This seemingly strict liability standard attaches to violations of CLA disclosure requirements as well.

require notice of the bank's use of the security deposit to make money for the bank without sharing those profits with the plaintiffs. These provisions state:

Each lessor shall give a lessee prior to the consummation of the lease a dated written statement on which the lessor and lessee are identified setting out accurately and in a clear and conspicuous manner the following information with respect to that lease, as applicable:

(4) The amount of other charges payable by the lessee not included in the periodic payments, a description of the charges and that the lessee shall be liable for the differential, if any, between the anticipated fair market value at the termination of the lease, if the lessee has such liability;

(5) A statement of the amount or method of determining the amount of any liabilities the lease imposes upon the lessee at the end of the term and whether or not the lessee has the option to purchase the leased property and at what price and time;

\* \* \* \* \* \*

(8) A description of any security interest held or to be retained by the lessor in connection with the lease and a clear identification of the property to which the security interest relates ...

When interpreting a statute a court looks "first and foremost to its text." *United States v. Alvarez–Sanchez*, 511 U.S. 350, ——, 114 S.Ct. 1599, 1603, 128 L.Ed.2d 319 (1994). None of these provisions speaks *directly* about a lessor's profits from a lessee's security deposit. Because the statute makes no direct mention of the use or earning from security deposits, it is "necessary to consider the implicit character of the statutory

scheme." *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 560, 100 S.Ct. 790, 794, 63 L.Ed.2d 22 (1980). Therefore, at least one of these three disclosure requirements must be construed "implicitly" to cover the bank's practice in order for the plaintiffs to state a claim under the CLA. On the other hand, if § 1667a simply does not apply to the retention of profits earned from a lessee's security deposit, plaintiffs fail to state a claim on which relief can be granted.

 Recognizing that TILA–covered transactions "defy exhaustive regulation by a single statute," Congress delegated "expansive authority to the Federal Reserve Board to elaborate and expand the legal framework" surrounding the CLA. *Milhollin*, 444 U.S. at 560, 100 S.Ct. at 794 (*citing* 15 U.S.C. § 1604). In carrying out its duty to publish regulations that strike an appropriate balance between "meaningful disclosure" and "information overload," *id.* at 568, the Federal Reserve Board, acting pursuant to 15 U.S.C. § 1604, promulgated "Regulation M," 12 C.F.R. § 213 *et seq.*, to fill in the statutory gaps of the CLA. As the Supreme Court stated in *Milhollin*, 444 U.S. at 560, 100 S.Ct. at 794, "[i]t is appropriate to defer to the Federal Reserve Board and staff in determining what resolution ... is implied by the truth-in-lending enactments" when no expression in the statute clearly governs the issue. Thus, in addition to the familiar rules of statutory construction,[3] I must give "great weight," *Investment Company Institute v. Camp*, 401 U.S. 617, 626–27, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971), to the administrative regulations promulgated by the Federal Reserve Board in interpreting the CLA.

Without reference to these principles, plaintiffs rely on two recent district court cases, *Werbosky v. Ford Motor Credit Co.*, 1996 WL 76133 (S.D.N.Y.1996) and *Demitro-*

---

**3.** These familiar rules of statutory construction include: giving nontechnical words their "ordinary and natural meaning," *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979); considering "not only the bare meaning of the word but also its placement and purpose in the statutory scheme," *Bailey v. United States*, —— U.S. ——, ——, 116 S.Ct. 501, 507, 133 L.Ed.2d 472 (1995); and interpreting a single statutory word or provision in "a context that makes its meaning clear," *United Savings*

*Assoc. of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 371, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988). If an administrative agency has promulgated regulations construing the statute, the court "should give great weight to any reasonable construction of the statute adopted by the agency charged with the enforcement of the statute." *Investment Company Institute v. Camp*, 401 U.S. 617, 626–27, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971).

*poulos v. Bank One Milwaukee, N.A.*, 924 F.Supp. 894 (N.D.Ill.1996), for support in their opposition to the defendant's motion. In *Werbosky*, Ford Motor Credit required a security deposit of $525 and earned profits from the use of the security deposit without remitting any of profit to the lessee. The plaintiff in *Werbosky*, like the plaintiffs here, claimed that this practice violated the disclosure requirements of § 1667a(4), (5), and (8). Without citing or discussing Regulation M or the legislative history of the CLA, the court in *Werbosky* held that Ford Motor Credit violated the CLA because its "retention of the profits imposes a liability on the lessee." *Werbosky*, 1996 WL 76133 at *2. The court concluded that § 1667a(5) "clearly encompasses the profits at issue here." *Id.* Later, the court described § 1667a(5) as "the provision most likely to impose a duty [of disclosure] on defendant." *Id.*

As a second basis for finding a CLA disclosure violation, the court stated in *Werbosky*:

> Furthermore, [§ 1667a(4)] encompasses the profits at issue. Defendant argues that the profits are not "payable" because "plaintiff has no obligation to pay interest on her security deposit to Ford Credit." ... This argument makes no sense. There is no doubt that Ford Credit must pay the profits to a lessee. Ford Credit's failure to do so means that, when the lease commences, the profits are payable to Ford Credit.

*Id.*[4]

Finally, with respect to the disclosure requirement of § 1667a(8), the court in *Werbosky* reached no conclusion, stating that it "need not address that issue." *Id.*

In *Demitropoulos*, the plaintiff provided a $550 security deposit for an automobile lease, and the defendant did not disclose its practice of retaining any interest earned on the deposit. The court, without engaging in a detailed analysis, found "all three disclosure provisions [§ 1667a(4), (5), and (8)] applicable to Bank One's practice of retaining security deposit interest." 924 F.Supp. at 898. In support of its finding that the CLA required such disclosure, the court relied solely on *Werbosky* without citing Regulation M or the legislative history of the CLA.

Notwithstanding the decisions in *Werbosky* and *Demitropoulos*, I conclude for the following reasons that the statutory language and context, Regulation M, and the legislative history of the CLA compel a different result than was reached in those cases. In my view, the disclosure provisions on which plaintiffs base their CLA claim do not apply to defendant's practice of earning and keeping a profit from plaintiffs' security deposit.

### Sections 1667a(4) & (5): Other Charges and Liabilities

First, plaintiffs argue that the "profits from deposits" practice is covered by § 1667a(4), which requires disclosure of:

> [t]he amount of other charges payable by the lessee not included in the periodic payments, a description of the charges and that the lessees shall be liable for the differential, if any between the anticipated fair market value of the leased property and its appraised actual value at the termination of the lease, if the lessee has such liability.

Plaintiffs contend that the interest earned from their security deposit is money owed to plaintiffs[5] and failure to return such money

---

**4.** This passage from *Werbosky* seems to conflate the procedural issue of disclosure with the substantive issue of whether a lessor can legally retain profits earned from a lessee's security deposit. Just because Ford Motor Credit must, by state law, pay the profits to the lessee does not convert those profits into "charges payable by the lessee."

**5.** Plaintiffs claim they are entitled to the money earned as interest from their deposit pursuant to O.R.C. § 1309.18(B)(3), which states "the secured party [defendant] may hold as additional security any increase or profits, except money,

received from the collateral [security deposit], but money so received, unless remitted to the debtor [plaintiffs], shall be applied in reduction of the secured [lease] obligation." I make no determination as to the validity of that claim because a ruling on that claim is not necessary to dispose of the plaintiffs' CLA claim. Even if plaintiffs might be entitled to the profits under state law—a disputed issue that should be resolved by a state court—defendants might not be required to tell the plaintiffs that profits might be earned and paid accordingly.

"results in plaintiffs paying additional amounts under the Lease." (Doc. 10 at 11). According to plaintiffs, this payment of an additional amount under the lease constitutes an "other" charge payable by the lessee; *i.e.*, a hidden charge that is "not included in the periodic payments."

As noted, § 1667a(4) makes no direct mention about interest on a security deposit: it only discusses "charges." The question, then, is whether the accrual and retention of interest earned from plaintiffs deposit constitutes a "charge payable," as that term is used in the CLA. I conclude it does not.

■ An "ordinary and natural reading" of a statute's terms governs its interpretation. *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). In *Milhollin,* the Supreme Court, though not considering § 1667a(4), stated that a delinquency or "similar" charge "self-evidently refers to a *specific* assessable sum." 444 U.S. at 561, 100 S.Ct. at 795 (emphasis added). Furthermore, as the Supreme Court stated in that case, the TILA and the Board-issued regulations "confirm[ ] the interpretation of 'charges' as *specific* penalty sums." *Id.* (emphasis added). Though the Supreme Court in *Milhollin* was interpreting the TILA, rather than the CLA, the term "charge" would have the same meaning for TILA and CLA purposes because "[i]n interpreting the CLA, courts borrow TILA definitions, damage provisions and general rules of construction." *Wiskup v. Liberty Buick Co., Inc.,* 1996 WL 18896 at *2 (N.D.Ill.1996).

In this case, moreover, any profits earned through the use of plaintiffs' deposit could never be considered "specific" because the amount of profit depends entirely on how and where defendant chooses to invest or keep the deposit, a fact unknown at the time of lease consummation. The inability to determine specific profits earned from plaintiffs's deposit is underscored by defendant's treatment of the security deposit as an "asset" and "property" of the bank subject to the bank's obligation to repay the amount of the deposit. (Doc. 6 at 9). The futility of trying to identify profits earned directly from plaintiffs' deposit undermines the notion that these profits are "specific" assessments.

■ Although plaintiffs did not have use of the security deposit during the lease term, mere unavailability of those funds is not, in my view, a "charge" either within the common meaning of that term or the context of § 1667a(4). A contrary determination finds no support in the legislative history of the CLA.[6] Furthermore, whether interest earned by a bank on a security deposit is "payable" to plaintiffs appears to be a matter of unsettled state law.[7] This uncertainty weakens plaintiffs' claim that the interest is payable to them.

In conclusion, to construe interest earned on deposits as "other charges payable" so as to require disclosure, would require stretching § 1667a(4) "beyond [its] obvious limit." *Milhollin,* 444 U.S. at 562, 100 S.Ct. at 795. I conclude, therefore, that the practice of retaining interest earned from plaintiffs deposit is not covered by § 1667a(4). Thus, the nondisclosure of that practice does not violate § 1667a(4) of the CLA.

■ Plaintiffs also argue that § 1667a(5) mandates disclosure of defendant's earnings from plaintiffs' deposit. Section 1667a(5) requires the lease to state "the amount or method of determining the amount of any

---

6. In a section-by-section analysis of the requirements of § 1667a, the Congressional reports accompanying the passage of the CLA do not discuss the practice of a lessor's earning and keeping profits from a security deposit. *See* H.R.Rep. No. 544, 94th Cong., 1st Sess. (1975); S.Rep. No. 590, 94th Cong., 2d Sess. (1976), *reprinted in* 1976 U.S.C.C.A.N. 431; H.R.Conf. Rep. No. 872, 94th Cong., 2d Sess. (1976), *reprinted in* 1976 U.S.C.C.A.N. Nor do the Congressional floor debates address the issue of a lessor retaining profits earned from a lessee's refundable security deposit. *See* 121 Cong.Rec. 34,040–46 (1975); 122 Cong.Rec 1916–19 (1976); 122 Cong.Rec. 5781–82 (1976); 122 Cong.Rec. 5835–37 (1976). The floor debates address a myriad of sub-issues surrounding the passage of the CLA, but say nothing about how to deal with a lessor who retains interest earned from a lessee's security deposit.

7. The parties vigorously contest whether: (1) Huntington is exempt from the Ohio Consumer Sales Practices Act, O.R.C. § 1345.01(A)(1); and (2) the lease agreement creates a security interest under the Ohio Uniform Commercial Code O.R.C. § 1309.18.

liabilities the lease imposes upon the lessee at the end of the term." In keeping profits earned from their security deposit, the bank, plaintiffs contend, effectively imposes a liability on the plaintiffs which must be disclosed pursuant to § 1667a(5). A look at the structure of the CLA, as well as Regulation M and the legislative history of the CLA reveals, however, that the term "liability" does not encompass profits earned from a lessee's security deposit.

Without any reference to interest earned from a security deposit, the CLA directly addresses the issue of liability at the end of the lease term in § 1667b. That section relates to a specific form of end-lease liability—the amount a lessee will have to pay in depreciation costs. 15 U.S.C. § 1667b(a). Regulation M likewise discusses liability at the end of the lease without addressing interest earned from the use of a lessee's security deposit. Regulation M describes examples of end-term lease liabilities such as "disposition and pick-up charges," or any extra charges incurred due to a lessee's failure to return the property to a designated location. 12 C.F.R. Pt. 213, Supp. I at 381. Regulation M does not exhaustively list every liability which must be disclosed, but "disposition" and "pick-up" charges differ fundamentally from interest earned from a security deposit.

Finally, the Congressional committee and conference reports, as well as the floor debates, discuss liabilities at the end of the lease in terms of an entirely different character than interest earned on a security deposit. These materials refer to liabilities in terms of specifically assessed charges for depreciation, damage, or failure to return the property to a designated place. *See* H.R.Rep. 544, 94th Cong., 1st Sess. 7 (1975); S.Rep. 686, 94th Cong., 2d Sess. 8–9 (1976). In light of that discussion, a "liability" does not encompass a lessor's practice of earning and retaining profits from a lessee's security deposit.

■ The absence of any specific mention in the CLA and its legislative history of the use of security deposits or allocation of the earnings from such use is not the only basis on which the bank is entitled to dismissal. Appendix C of the Federal Reserve Board's CLA regulations contains three "model forms," including a "Model Closed–End or Net Vehicle Lease." 12 C.F.R. Pt. 213, App. C at 367–68 (attached as Exhibit B). "Although lessors are not required to use these forms," the model forms "meet [the] standard" of "clear and conspicuous" disclosure, *id.* Supp. I at 379. Lessors using the model forms "will be deemed in compliance with the regulations." *Id.* Supp. I at 385. Additionally, "[l]essors may make certain changes in the format or content of the forms and may delete any disclosures that are inapplicable to a transaction without losing the act's protection from liability." *Id.*

■ In this case, the defendant's lease contains all the information specifically set forth in the model lease. Indeed, defendant's lease discloses much more information than required in the model lease: the model has 16 substantive paragraphs while defendant's lease contains 42 paragraphs. Finally, and most persuasively, the model lease, like defendant's lease, neither mentions interest earned on a security deposit nor characterizes such interest as an "other charge" or "liability." To the extent that defendant's lease varies from the model form, that lease provides more—not less—disclosure. Those deviations, therefore, cannot be grounds for withholding the protection from liability afforded by the regulations. Because defendant's lease conforms to the Federal Reserve Board's model lease, the defendant is "deemed in compliance with the regulations," and is not compelled by the CLA to disclose its practice of retaining interest earned from plaintiffs' refundable security deposit.

### Section 1667a(8)

■ Finally, plaintiffs argue that § 1667a(8) mandates the disclosure of any intent to retain profits earned from plaintiffs' deposit. Section 1667a(8) requires "a description of any security interest held or to be retained by the lessor in connection with the lease." Plaintiffs argue that the security deposit is a "security interest" held by defendant in connection with the lease, and thus is subject to disclosure. As noted by defendant, however, Regulation M resolves this issue in defendant's favor.

To reach a conclusion with respect to § 1667a(8), three Federal Reserve Board administrative regulations must be examined together. First, 12 C.F.R. § 213.4(g)(9) requires a "description of any security interest, other than a security deposit disclosed under paragraph (g)(2) of this section." Second, § 213.4(g)(2) requires disclosure of "[t]he total amount of any payment, such as a refundable security deposit ... to be paid at the consummation of the lease." 12 C.F.R. § 213.4(g)(2). Finally, "consummation of the lease" is defined as "the time a contractual relationship is created between the lessor and lessee, irrespective of the time of performance of either party." 12 C.F.R. § 213.2(b)(2).

Taken together, these three provisions demonstrate that the security deposit collected from plaintiffs need be disclosed only once, as an "initial payment" at the time the lease was consummated (*i.e.*, December 23, 1995). The lease clearly discloses this refundable security deposit; thus, defendant is in compliance with 15 U.S.C. 1667a(8) and its implementing regulations.

### *Conclusion*

█ Because I do not construe § 1667a(4), § 1667a(5), or § 1667a(8) as re-

quiring the disclosure of defendant's practice of earning a profit through the use of plaintiffs' security deposit, plaintiffs fail to state a claim under the CLA.[8] I reach this conclusion based on a my interpretation of the CLA and its implementing regulations and legislative history. Absent some basis in the statute, I will not impose an otherwise nonexistent disclosure requirement on the defendant. Such disclosure could be mandated by Congress or the Federal Reserve Board, but not under the circumstances of this case and the statute as now written. Judges, as the Supreme Court noted in *Milhollin,* "are not accredited to supersede Congress or the appropriate agency by embellishing upon the regulatory scheme [and] caution must temper judicial creativity in the face of legislative or regulatory silence." 444 U.S. at 565, 100 S.Ct. at 797.[9]

For the foregoing reasons, it is

**ORDERED THAT** defendant's motion for dismissal under 12(b)(6)(Doc. 6) be, and hereby same is granted; and it is

**FURTHER ORDERED THAT** plaintiffs' state law claims are dismissed for want of diversity jurisdiction, without prejudice.

**So ordered.**

---

8. If this decision were reversed on appeal, I would give serious consideration to certifying at least one state law issue—whether the security deposit qualifies as a "security interest" under O.R.C. § 1309.18—to the Ohio Supreme Court pursuant to Supreme Court Rule of Practice XVIII.

9. I note that Congress, having amended the CLA on three occasions, has had ample opportunity to require the disclosure demanded by the plaintiffs, but has thus far declined to do so. *See* Pub.L. 96–221, Mar. 31, 1980, 94 Stat. 185; Pub.L. 103–325, Sept. 23, 1994, 108 Stat. 2234; Pub.L. 104–29, Sept. 30, 1995, 109 Stat. 271. Furthermore, the Federal Reserve Board recently issued a comprehensive proposal to revise Regulation M which fails to address the practice complained of in this action. *See* 60 Fed.Reg. 48,752 (1995) (proposed Sept. 20, 1995).

678

# CLOSED-END VEHICLE LEASE AND DISCLOSURE STATEMENT

Date: 12/24/~ LESSEE: John E. Gaydos

LESSOR: Huntington National Bank LESSEE: Mary M. Gaydos
ADDRESS: P.O. Box 2268 ADDRESS: 1312 Vine St.
Toledo, OH 43603 Sandusky, OH 44870

THIS AGREEMENT (the "Lease") covers your lease from us of the motor vehicle (the "Vehicle") described below with all equipment, parts and accessories. The terms and conditions of your lease are stated in this document. In this Lease, "you" and "your" mean each person who signs this Lease as Lessee. "We", "us" and "our" mean the Lessor and the Lessor's assignee. Each of you is responsible, individually and together, for compliance with this Lease. The Lessor is known as "grantee(s) and" responsibility.

These Disclosures Are Provided Pursuant to the Federal Consumer Leasing Act

**1 DESCRIPTION OF VEHICLE:** ☒ New ☐ Used ☐ Demo Beginning mileage at Vehicle delivery: 26
Year: 1996 Make: Dodge Model: Grand Caravan ES
Body Style: VIN: 1B4GP54LXTB280818

**2 INITIAL CHARGES:**
| | | |
|---|---|---|
| (a) First Monthly Payment | $ | 407.28 |
| (b) Refundable Security Deposit | $ | 425.00 |
| (c) Tax, License & Registration Fees | $ | 75.00 |
| (d) Downpayment | | |
| (i) Cash | $ N/A | |
| (ii) Trade-in | $ N/A | |
| (iii) Total | | $ N/A |
| (e) Sales Tax on Downpayment | | $ N/A |
| (f) Other Charges: | | |
| (i) Lease Processing Fee | $ N/A | |
| (ii) | $ N/A | |
| (iii) Total Other Charges | | $ N/A |
| (g) TOTAL INITIAL CHARGES | | $ 907.28 |

**3 MONTHLY PAYMENTS:**
| | | |
|---|---|---|
| (a) Monthly Rental | $ | 384.23 |
| (b) Other (specify): | $ | N/A |
| (c) State Sales or Use Tax (County | $ | 23.05 |
| (d) Other (specify): | $ | N/A |
| (e) Total Monthly Payment | | $ 407.28 |

*All taxes are based on current rates — you are responsible for payment of any increase.

**4 LEASE TERM:** (a) 48 months. You agree that the first monthly payment and other initial charges are due on the date of this Lease. The remaining monthly payments are due and payable beginning 1 month after the delivery date for the Vehicle. These remaining monthly payments continue on the same day of each month until all payments are made. If the payment due date would fall on the 29th, 30th, or 31st of the month, the payment due date will be the 1st of the following month. The term of this Lease begins on the delivery date for the Vehicle and ends 1 month after the due date of the final monthly payment.

**5 TOTAL OF MONTHLY PAYMENTS (4(a) x 3(e)):** $19,549.44

**6 FEES AND TAXES:** Estimated total amount you will pay during the term of this Lease for official fees, registration, certificate of title, license fees and taxes: $1,166.40

**7 LATE PAYMENTS, RETURNED CHECKS AND ADMINISTRATIVE FEE:**
(a) You agree to pay us a late charge of $20 for each monthly payment that is late if a payment is late if we do not receive it within 10 days after its due date.
(b) You agree to pay us interest on any amounts due under this Lease, other than monthly payments, that are late. An amount is late if we do not receive it within 10 days after we send you an invoice for the amount. Interest will be at the rate of 1½% per month from the date of the invoice.
(c) You agree to pay us a returned check charge of $20 each time you pay us with a check, money order, or similar item and it is returned to us unpaid after we try to collect it.
(d) You agree to pay us an administrative fee of $25 each time we pay a charge, tax or other item for you under Sections 27(g) or 36(a). You also agree to pay the administrative fee each time you allow your insurance to lapse.

**8 MILEAGE ALLOWANCE:**
(a) The mileage allowance for this Lease is 12,000 miles per year. This is a total mileage allowance of 48,000 miles for the full scheduled term of this Lease.
(b) If either you or we terminate this Lease early, we compute an adjusted mileage allowance. To do this we first divide the total mileage allowance by the number of months in the Lease term (Section 4 (a)). We then multiply that result by the number of monthly payments that have been paid under this Lease.

**9 EXCESS MILEAGE CHARGE:** The excess mileage charge is 14 cents for each excess mile. The mileage plan marked below is applicable to this Lease (if no box is checked, the Basic Mileage Plan is applicable):

☒ Basic Mileage Plan: You must pay us the excess mileage charge shown above for each excess mile.

☐ Flexible Mileage Plan: You must pay us the excess mileage charge shown above for each excess mile. We will give you a mileage credit of _____ cents for each credit mile up to a maximum of _____ credit miles.

**10 HOW WE DETERMINE MILEAGE:** We use the following rules to determine excess miles or credit miles.
(a) We determine the number of miles the Vehicle has been driven by the mileage on the Vehicle odometer at the time the Vehicle is returned to us, minus the beginning mileage shown in Section 1.
(b) If this Lease goes full term, excess miles equals the number of miles driven more than the total mileage allowance, and credit miles equals the number of miles driven less than the total mileage allowance.
(c) If either you or we terminate this Lease early, excess miles equals the number of miles driven more than the adjusted mileage allowance, and credit miles equals the number of miles driven less than the adjusted mileage allowance.
(d) If the Vehicle odometer has failed to operate for any period of time, we may not be able to determine the mileage from the Vehicle odometer. In that case, we will use the best evidence available to us to determine the mileage. This includes any evidence you may be able to give us. You agree that our determination is final. Additionally, we have the right to assess a faulty odometer charge as described in Section 21(d).

**11 STANDARDS FOR WEAR AND TEAR:** You agree to maintain the Vehicle in its original condition as its appearance and mechanical performance, other than reasonable wear and tear that is not excessive. When the Vehicle is returned to us, we or our representatives will inspect it and notify you of the charges to repair any excess wear and tear. You agree to pay us that amount. The following wear and tear shall be any of the following:
(a) Mechanical: Mechanical and/or electrical defects or failure of the Vehicle or any of its parts or accessories.
(b) Exterior: Any body damage, scratches, rust, corrosion or similar damage which would require repair/refinishing. Loose, broken, cracked or missing trim. Damaged glass (bulls eye, cracked, pitted or broken) or inoperable component. Improperly performed body or paint work. Hidden or structural damage. Alterations such as decals, drilled holes and/or any other alterations to the Vehicle whether or not previously approved by us.
(c) Interior: Any scratched/damaged panels or moldings. Stained, ripped, burned or worn-out upholstery or carpets. Other interior damage that alters the normal condition of the Vehicle.
(d) Tires: Any tires which if not part of a matching set at 4(h.e., matching in terms of stripe, brand and manufacturer) plus spare. Any tire which is not at a minimum equal in quality to that originally delivered with the Vehicle (such as all-brand, blemished or snow tires). Any tire that is damaged, defective or has less than 1/8" remaining tread across the entire tire surface.

**12 MAINTENANCE:** You must pay for all maintenance and repairs to keep the Vehicle in good working order and condition. You must pay for all gasoline, oil, and other expenses of operating the Vehicle. You must service the Vehicle according to the manufacturer's recommendations as specified in the owner's manual or the maintenance schedule folder. You must return the Vehicle in original condition other than reasonable wear and tear that is not excessive.

**13 RETURN OF VEHICLE:**
(a) You must return the Vehicle to us by the last day of the scheduled Lease term at the location we designate, unless you have used your option to purchase the Vehicle. If either you or we terminate this Lease early, you must return the Vehicle to us at the location we designate no later than the day the Lease is terminated. The location we designate will be in the geographic area where we deliver the Vehicle to you. You must return the Vehicle with all equipment that was originally delivered. If you return the Vehicle to a location other than the one we designate, you agree to pay us an out-of-area return charge of $150.
(b) If you fail to return the Vehicle to us when required to do so under this Lease, we have the right to require it. To take the Vehicle, you may enter the premises where the Vehicle is stored and remove it. We will not breach the peace. We may use any property in the Vehicle at the time of making and hold it for you as discussed in Section 33. Our recovery of the Vehicle does not release you from any obligation under this Lease.
(c) You agree to pay our reasonable attorney's fees, court costs and other costs of retaining the Vehicle and returning it to our designated location. Additionally, until we are able to return the Vehicle, we will charge you the full amount of the monthly payment (Section 3(e)) for each month or part of a month that you fail to return the Vehicle to us.

**14 INSURANCE:** You must keep in and keep in force the following minimum coverages during the Lease term and until the Vehicle is returned. The insurance policy must name as an additional insured and loss payee. You may obtain coverage from an insurer of your choice, subject to our right to refuse an insurer for reasonable cause.
| | | |
|---|---|---|
| (a) Bodily Injury (Each Person) | $100,000 | (e) Fire, Theft & Comprehensive (subject to deductible of not more than $500) |
| (b) Bodily Injury (Each Accident) | $300,000 | (f) Collision (subject to deductible of not more than $500) |
| (c) Property Damage | $50,000 | (g) Uninsured Motorist |
| (d) Medical Payments (Each Person) | $5,000 | |

Insurance Agent: Cindy Doceros Agent Phone No: 419-668-5528
Address: Insurance Co: State Farm
City/State/Zip: Sandusky, OH 44870 Policy/Binder Number: 765-9114A-H-30.2

**15 WARRANTIES:** ☐ Unless this box is checked, the Vehicle is subject to the standard manufacturer's express warranty.
Other express warranty: _____
Section 15 describes any extended warranty. THERE ARE NO OTHER EXPRESS WARRANTIES WITH RESPECT TO THE VEHICLE. WE MAKE NO IMPLIED WARRANTY OF MERCHANTABILITY. THERE IS NO WARRANTY THAT THE VEHICLE IS FIT FOR A PARTICULAR PURPOSE.

**16 EXTENDED SERVICE CONTRACT/WARRANTY (If Applicable):** Your Initials: [ ]
If you have checked the above box, you have chosen to purchase an extended service contract/warranty. We do not require this in connection with this Lease. The benefits are described on the certificate you have received.

**17 OPTION TO PURCHASE:** You have no obligation to purchase the Vehicle. At the end of the scheduled Lease term, the provision denoted by the box checked below applies.
☒ You have the option to purchase the Vehicle for $14,857.90, plus any fees, taxes, or other amounts applicable to such purchase.
☐ You have no option to purchase the Vehicle.

680

I choose to purchase the ... and life insurance and disability insurance coverage indicated below. The total cost of the insurance coverage that I have elected is shown below. I choose to pay this amount, as part of the monthly rental amounts as shown in Section 3(a).

| | Premium | Initial Coverage |
|---|---|---|
| (a) Single Credit Life Insurance ..... | $ N/A | $ |
| (b) Joint Credit Life Insurance ..... | $ N/A | $ |
| (c) Credit Disability Insurance (on first insured only) ..... | $ N/A | $ |

Signature of first insured _____ (Age) Signature of second insured (if joint insurance) _____ (Age)

**19. EARLY TERMINATION**
(a) You may terminate this Lease early, subject to the terms of this Lease that apply if you do so.
(b) We may terminate this Lease early if you default. You default if:
- you fail to pay any monthly payment by its due date
- you fail to pay any other amount due under this Lease within 10 days after we send you an invoice for such amount
- you fail to comply with any of your obligations under this Lease
- you are insolvent or file for bankruptcy or a proceeding in bankruptcy, receivership or insolvency is filed against you or your property,
- you make an assignment for the benefit of creditors,
- you do not maintain the insurance required by the Lease or the insurance company refuses to continue to insure any operation of the Vehicle
- the Vehicle is damaged beyond repair, is stolen or is subject to any levy, execution, seizure, or impoundment
- you do or attempt to do any of the following without our written consent; sublease, rent, assign, grant a security interest in or otherwise transfer your or the interest under this Lease or in the Vehicle,
- you have made any material misrepresentation or omission on your Lease application or otherwise
- you fail to answer any traffic summons or any fines, penalties, taxes or other amounts when due
- you or anyone you allow to drive or occupy the Vehicle is arrested for, charged with, or convicted of any violation (other than a minor traffic violation), misdemeanor, or felony involving the Vehicle in any manner.
- you die,
- (if you are a partnership) any partner dies or the partnership dissolves
- (if you are a corporation) the corporation dissolves, merges, consolidates, or has a change in ownership
(c) If you are in default, we will have all the rights and remedies provided by law, in equity, and under this Lease. We may sue you for damages. We may also terminate this Lease and take the Vehicle without demand. Our rights are cumulative and not exclusive or alternative. We may exercise them at the same time or at different times. We can delay or waive any of our rights without losing them or diminishing their effect. This does not become a delay or waiver for any other or future event. We can accept late payments or partial payments without losing or diminishing any of our rights. This is so even if the payments are marked "payment in full" or similar language.

**20 EARLY TERMINATION CHARGE**
(a) Your monthly payment amount depends on the length of this Lease. Longer leases have lower monthly payments than shorter ones if all other terms of a lease are the same. When the Lease term is shortened because you or we terminate the Lease early, we recompute the payment for a lease of the shortened term. Because the shortened term payments would have been higher, we recover the difference as the "Early Termination Charge"
(b) If either you or we terminate this Lease early, we do not require you to pay us all monthly payments not yet due at that time. Instead you must pay us the Early Termination Charge in a lump sum within 10 days after we send you an invoice for that amount. Also we have additional costs if either you or we terminate this Lease before the due date at the 13th monthly payment. If either you or we terminate before the 13th payment, you must also pay us all of the first 12 monthly payments. These are due at the same time as the Early Termination Charge, except for the ones you have already paid.
(c) You can compute the Early Termination Charge from the table below. First, locate the "Month of Termination" column at the month at which early termination occurs. Then, locate the column under "Scheduled Lease Term (Months)" for the scheduled term of the Lease. The factor that is used to compute the Early Termination Charge appears in the table where your month of termination meets your scheduled Lease term. Multiply the factor times the monthly rental amount (Section 3(a)). Then multiply that product by the number of monthly payments required to have been made under this Lease at the time of early termination.

| Month of Termination | SCHEDULED LEASE TERM (MONTHS) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Up to 24 | 25-27 | 28-30 | 31-33 | 34-36 | 37-39 | 40-42 | 43-45 | 46-48 | 49-51 | 52-54 | 55-57 | 58-60 |
| 1-14 | .430 | .530 | .620 | .700 | .780 | .850 | .925 | .985 | 1.050 | 1.115 | 1.170 | 1.240 | 1.300 |
| 15-17 | .255 | .340 | .420 | .495 | .560 | .625 | .690 | .740 | .800 | .855 | .905 | .965 | 1.020 |
| 18-20 | .135 | .215 | .285 | .350 | .410 | .465 | .525 | .575 | .625 | .675 | .720 | .780 | .830 |
| 21-23 | .045 | .120 | .185 | .245 | .300 | .355 | .410 | .450 | .500 | .545 | .590 | .640 | .685 |
| 24-26 | N/A | .045 | .105 | .160 | .215 | .260 | .315 | .355 | .400 | .445 | .480 | .530 | .575 |
| 27-29 | N/A | N/A | .040 | .090 | .140 | .185 | .235 | .270 | .315 | .355 | .390 | .435 | .475 |
| 30-32 | N/A | N/A | N/A | .035 | .080 | .120 | .170 | .205 | .245 | .285 | .315 | .360 | .400 |
| 33-35 | N/A | N/A | N/A | N/A | .030 | .070 | .115 | .150 | .185 | .225 | .255 | .295 | .335 |
| 36-38 | N/A | N/A | N/A | N/A | N/A | .025 | .065 | .100 | .135 | .170 | .200 | .240 | .275 |
| 39-41 | N/A | N/A | N/A | N/A | N/A | N/A | .025 | .055 | .090 | .125 | .155 | .195 | .225 |
| 42-44 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | .020 | .055 | .085 | .115 | .150 | .185 |
| 45-47 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | .020 | .050 | .080 | .115 | .145 |
| 48-50 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | .020 | .045 | .080 | .110 |
| 51-53 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | .015 | .045 | .075 |
| 54-56 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | .015 | .045 |
| 57-59 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | .015 |

(d) Use of the above factors provides an approximate recomputation of the shortened term lease payment as described in Section 20(a). We use this method because it is simple to compute. We do not use a more precise method because of the complexity and difficulty of doing so for any specific lease. You agree that the amount is fair and reasonable even though in your specific case the Early Termination Charge may be more or less than the actual recomputation amount.

**21 ADDITIONAL TERMS THAT APPLY UPON FULL TERM OR EARLY TERMINATION**: The following provisions apply if this Lease goes full term. These provisions also apply if either you or we terminate this Lease early. These are in addition to any amounts due under Section 20(b). These are also in addition to your obligation to return the Vehicle (Section 13)
(a) You must pay any monthly payments that are due under this Lease at the time of early termination or at the end of the scheduled term of this Lease
(b) You must pay other sums that are due under this Lease at the time of early termination or at the end of the scheduled term of this Lease or that become due afterward. Examples of such sums include excess mileage charges, excess wear and tear charges, sales and fees due at that we have paid on your behalf. Other examples include late charges, returned check charges, administrative fees, repossession charges, out-of-area return charge
(c) You must also pay our reasonable attorney's fees, court costs and our other costs of collecting amounts you owe us. We will not charge you any amounts prohibited by law.
(d) If the Vehicle odometer has failed to operate for any period of time and we are required to sell the Vehicle "mileage unknown", we may require you to pay us a faulty odometer charge of $1,500. This charge applies whether or not the odometer has been repaired. This charge is intended to reimburse us for loss in market value to the Vehicle because it must be sold "mileage unknown".
(e) Subject to our right of setoff, if any, we will pay you (or credit to sums you owe) your security deposit and any mileage credit
(f) We do not base your liability on the Vehicle's estimated or realized value. You do not have to pay any deficiency in the sale price when we sell the Vehicle. You are not entitled to any of the sale proceeds (including any surplus that results from the sale). We are not required to notify you of the sale or give you an accounting of the sale proceeds.
(g) You will not be paid the proceeds of any insurance on the Vehicle (except as provided in Section 27(f)). If there is a total loss or theft of the Vehicle, you must pay us the amount of any insurance deductible. If there is a total loss or theft of the Vehicle and we do not receive insurance proceeds in the amount of the fair value of the Vehicle, you must pay us the difference between the amount we receive and the Vehicle's fair value. You and we agree that the Vehicle's fair value will be the average retail value from the then current National Automobile Dealers Association Official Used Car Guide (the "NADA Guide"), adjusted for applicable mileage and equipment. If the NADA Guide is not then available, we may use any reasonable method to determine the Vehicle's value

**22 USE**: You agree that the Vehicle will be used primarily for:
☐ business, or ☒ personal, family, or household use. Your initials ___ SG m/d

You understand and agree that if this Lease is primarily for business purposes the Federal Consumer Leasing Act does not apply to this Lease. This is also true if this Lease is not primarily for business purposes, but the total contractual obligation exceeds $25,000. This is so even though we provide some or all of the disclosures required by that Act

☒ Bank as Lessor: If this box is checked, the following dealer or leasing company helped to arrange this Lease _Sanctuary Cld_
☐ Dealer as Lessor: If this box is checked, The Huntington National Bank helped to arrange this Lease
YOU AGREE TO ALL THE PROVISIONS OF THIS LEASE, INCLUDING THE ADDITIONAL TERMS ON THE REVERSE SIDE. YOU REPRESENT THAT YOU HAVE READ THIS LEASE. DO NOT SIGN THIS LEASE UNLESS ALL BLANK SPACES ARE COMPLETED. YOU ALSO ACKNOWLEDGE THAT ONE OF YOU HAS RECEIVED A COMPLETED COPY OF THIS LEASE. THIS LEASE IS NOT VALID UNLESS SIGNED BY BOTH LESSOR AND LESSEE.
NO EMPLOYEE OR REPRESENTATIVE OF THE DEALER OR LEASING COMPANY IS AUTHORIZED (1) TO BIND THE HUNTINGTON NATIONAL BANK TO ANY TERMS AND CONDITIONS OR SIDE AGREEMENTS THAT ARE INCONSISTENT WITH OR NOT COVERED BY, THE PROVISIONS OF THIS LEASE AS SET FORTH IN THIS DOCUMENT, OR (4) TO ALTER OR CHANGE ANY OF THE PREPRINTED PROVISIONS OF THIS LEASE.
NOTICE: SEE OTHER SIDE FOR OTHER IMPORTANT TERMS OF THIS LEASE, INCLUDING BUT NOT LIMITED TO, A PROHIBITION OF TRANSFER OF LESSEE'S INTEREST

LESSOR (as identified above) LESSEE(S) (as identified above)
 Individual Signers.
By _____ _____ (Signature)
 (Authorized Signer) _____ (Signature)
**Assignment**
If the Dealer is the Lessor, Lessor hereby assigns this Lease pursuant to the terms of the Assignment contained on the reverse side
 Corporation, Partnership or Other Entity
Lessor (as identified above) By _____
By _____ Title _____
 (Authorized Signer)

**Modification or Rescission**
This Lease is the entire agreement between you and us. This Lease cannot be changed, modified, or rescinded except in a written document signed by the party to be bound by such change, modification, or rescission.
Individual Lessee(s) (as identified above) Corporation, Partnership or Other Entity Lessee
_____ (Signature) (as identified above)
_____ (Signature) By _____
 Title _____

**Vehicle's Delivery**
By signing below, you accept the Vehicle. You are also telling us that you are satisfied with the condition of the Vehicle and that it has all of the equipment you requested. You acknowledge that you currently have in force at least the minimum insurance coverages described in Sections 14 and 27(a) of this Lease.
Lessee Signature _____ Delivery Date _____

23. **OWNERSHIP OF THE VEHICLE:** You agree that this document is a lease and not a contract of sale or a security agreement. You will have no rights of ownership or title to the Vehicle. You will have the use of the Vehicle under the expiration or termination of this Lease. You agree that because as a Lessee you have the use of the Vehicle, we may require you to do things or pay amounts that a Vehicle owner would normally be required to do or pay. These are described in this Lease.

24. **VEHICLE REGISTRATION AND LICENSE PLATES:** You agree to register the Vehicle in our name and obtain required license plates. You must do this at the times required by law. This must be consistent with ownership of the Vehicle. You must register and license the Vehicle in the state or other jurisdiction where you garage the Vehicle. You must pay when due all taxes, fees, and other charges of registering and licensing the Vehicle.

25. **EMISSION TESTING AND OTHER INSPECTIONS:** You agree to obtain all required emission testing at the times required by law. You agree to obtain any other required inspection or testing of the Vehicle at the times required by law. You must pay when due all charges of such testing and inspections. You must have a qualified mechanic perform all necessary repairs or maintenance to bring the Vehicle into compliance. You must pay for such repairs or maintenance when due.

26. **OTHER FEES AND GOVERNMENTAL CHARGES:** You agree to perform all other things and options required by law with respect to the Vehicle. You must do this at the times required by law. You must pay when due all taxes, fees and other charges in connection with taxes, fees and other required actions. You must pay when due all governmental charges related to any Vehicle.

27. **ADDITIONAL INSURANCE REQUIREMENTS:**
 (a) In addition to the insurance coverages described under Section 14, you must maintain any insurance required by law.
 (b) You agree to give us a certificate of insurance from the insurance company insuring the Vehicle. You agree to give us the certificate within 30 days after the delivery date for the Vehicle. You or your insurance company or agent must send or deliver the certificate to the following address (or to another address that we tell you):
 Huntington Vehicle Lease Insurance Center
 H20215
 P O Box 182259
 Columbus, Ohio 43260
 (c) You agree that your insurance policy must require your insurance company to notify us of any change in coverage or cancellation within 10 days after any change in coverage or cancellation.
 (d) You agree to notify us and your insurance company of any damages or loss to the Vehicle. You agree to notify us if the Vehicle has been seized or impounded. You must give this notice within 24 hours after the damage, loss, seizure or impoundment.
 (e) You authorize us to cash or negotiate checks received from your insurance company. You authorize us to endorse your name on such checks.
 (f) We will reimburse you out of any insurance proceeds we receive for repairs you make to the Vehicle if we authorize you to make the repairs. We will not reimburse you for the amount of the insurance deductible.
 (g) If you fail to maintain the insurance required by law and this Lease, we may obtain the insurance from a company of our choice and bill you for the cost.

28. **VEHICLE USE:** You agree to drive the Vehicle in a safe and careful manner and only when you are properly licensed. You will not allow others to drive the Vehicle unless they are reasonable licensed drivers and they promise to drive in a safe and careful manner. You promise not to use or allow the use of the Vehicle for any of the following:
 - for transportation of goods or passengers for a fee or other charge,
 - for pushing or towing another vehicle without our written consent,
 - in rough driving for a fee or other charge,
 - for travel outside the United States or Canada,
 - for any use that is illegal under any applicable law.

29. **LIENS AND ENCUMBRANCES:** You agree not to allow any lien or encumbrance to attach to the Vehicle. You agree to take all necessary actions to remove any lien or encumbrance that does attach to the Vehicle. You agree to pay all costs of doing this, including any attorney's fees.

30. **ALTERATIONS TO THE VEHICLE:** You agree not to make any alterations or add any special equipment to the Vehicle without our written consent. You agree not to alter, adjust or disconnect the odometer, emission controls or similar equipment.

31. **INSPECTION OF THE VEHICLE:** You agree to deliver the Vehicle to any reasonable location we designate for the purpose of inspecting the Vehicle. We have the right to ask you to do this at any time during the Lease term.

32. **ODOMETER STATEMENT:** When this Lease is terminated early or at the end of the scheduled term of this Lease, you agree to provide us with an odometer statement in the form we require. You will provide this no later than 10 days after our request. You agree to pay all costs of doing this.

33. **PROHIBITION OF TRANSFER OF LESSEE'S INTEREST:** You may not do or attempt to do any of the following without our prior written consent: sublease, rent, assign, grant a security interest in, or otherwise transfer your or our interest under this Lease or in the Vehicle. Any attempt you make to do any of these things is void and ineffective.

34. **ASSIGNMENT OF LESSOR'S INTEREST:** You agree that we may assign or transfer our rights under this Lease. Upon notification to you of such assignment or transfer, you agree to make payments as due to the assignee or transferee.

35. **PERSONAL PROPERTY IN THE VEHICLE:** You agree that we will not be responsible at any time for any personal property you keep or carry in the Vehicle. This is so during the Lease term and after return or retaking of the Vehicle. After return or retaking of the Vehicle, we or our representative will hold any such property found in the Vehicle for a period of 10 days. We are not required to notify you that such property has been found in the Vehicle. If you do not pick up the property within that time, we have the right to dispose of it in any manner that we determine.

36. **REIMBURSEMENT AND INDEMNIFICATION:**
 (a) You agree to reimburse us for any amounts we pay under this Lease that you are required to pay. Our payment of any of these amounts is at our discretion. It doesn't mean that we will continue to do this for you or that you don't have to do it any more. You must reimburse us immediately when we tell you to. This includes but is not limited to any sums we pay:
 - to register or license the Vehicle,
 - to remove any liens or encumbrances on the Vehicle,
 - to release the Vehicle from any impoundment or seizure,
 - for any outstanding fines, penalties, taxes, fees, assessments, and charges in connection with the Vehicle or this Lease.
 (b) You agree to indemnify us and hold us harmless from and against any and all liabilities:
 - arising out of the condition, maintenance, use, operation or storage of the Vehicle,
 - arising out of any accident or any damage to any other person involving the Vehicle,
 - arising out of any breach of any of your obligations and agreements under this Lease.
 Examples of these liabilities are:
 - losses, damages, injuries, claims, demands and expenses,
 - attorney's fees and other costs of defense.
 (c) Your agreements to reimburse us and indemnify us:
 - continue beyond the expiration or termination of this Lease,
 - apply regardless of any other compensation arrangements (such as, but not limited to, insurance or a worker's compensation scheme) unless we have actually been compensated for the liabilities.

37. **LESSOR'S CONSENT:** Whenever you must obtain our consent under this Lease, we are not required to grant it. We may set conditions for our consent if we choose to do so.

38. **INVOICES:** The monthly payments and initial charges are due when stated under this Lease. All other amounts payable under this Lease to us are due within 10 days after we send you an invoice for the amount.

39. **SEVERABILITY:** You and we agree that if any provision of this Lease is found unenforceable by any court, the remaining provisions of the Lease will remain in full force and effect.

40. **CHOICE OF LAW:** You and we agree that this Lease is governed by the law of the State of Ohio, without regard to the conflicts law of that state.

41. **SET-OFF:** You agree that if we are a bank, we have the right to set-off. This means that we may apply any money in any deposit account with us on which your name appears as owner or co-owner to the payment of the amount you owe us which is due.

42. **APPLICATION OF PAYMENTS:** You give us the right to apply any amounts you pay us under this Lease to the amounts you owe in the manner we determine regardless of your intent or designation.

---

**GUARANTY OF PAYMENT**

In this Guaranty "you" and "your" mean the person or persons signing this Guaranty "We", "us", and "our" mean the Lessor under the Lease that is on this same document and the Lessor's assigns.

By signing this Guaranty, you guarantee the prompt payment and performance of all of Lessee's payment and other obligations under the Lease when those obligations become due. If Lessee doesn't pay, you will have to. You are giving us this Guaranty to induce us to lease the Vehicle to Lessee.

You will remain liable under this Guaranty even if Lessee's obligations under the Lease are paid or performed. This is so even if we agree to changes in the terms of the Lease without your consent. Examples of such changes are that are not limited to: renewals of the Lease, extensions of time for payments, releasing others that are designated under the Lease or this Guaranty.

We are not required to give you any notice of Lessee's default under the Lease or any default under this Guaranty. We are not required to give you any notice of any change in the terms of the Lease. We are not required to give you any notice of any...

We may collect directly from you without first trying to collect from Lessee or anyone else. We do not have to use any security for this Guaranty before we collect from you. We may bring a lawsuit against you to enforce this Guaranty without first proceeding against anyone else or any security.

If two Guaranties is signed by more than one person, each of you are jointly and severally liable under this Guaranty. We may collect from any one or more of you or all of you. We may bring a lawsuit against any one or more of you or all of you to enforce our rights.

_____ (Signature of Guarantor) (Date)
Type or Print Name of Guarantor

_____ (Signature of Guarantor) (Date)
Type or Print Name of Guarantor

---

**ASSIGNMENT**

If the "Assignment" on the reverse side of this document is signed by Lessor, Lessor, for valuable consideration, hereby sells, assigns and transfers to The Huntington National Bank ("Huntington") all of its right, title and interest in and to this Lease and any Guaranty thereof, subject to the terms and conditions of the operating agreement in existence between Lessor and Huntington.

This Assignment shall not become effective until accepted by Huntington.

Lessor further warrants that prior to delivery of the Vehicle it had rented Lessee's insurance coverage as provided in Section 14 of the Lease.

Lessor acknowledges that Lessee has accepted delivery of the Vehicle and has received the manufacturer's warranty for such Vehicle, to the extent applicable. Furthermore, if the Vehicle is titled in the name of Lessor, Lessor hereby grants Huntington its power of attorney to make application for registration or for transfer of registration of the Vehicle, and the full power and authority to do and perform all and every act whatsoever necessary or proper regarding the Vehicle as Lessor might or could do.

## EXHIBIT B

### C-2—Model Closed-End or Net Vehicle Lease Disclosures

Date _____

These disclosures are provided pursuant to the Federal Consumer Leasing Act.

1. LESSOR(S) _____ LESSEE(S) _____
_____ _____
_____ _____

2. Description of leased property

| Year | Make | Model | Body Style | Vehicle ID # |
|------|------|-------|------------|--------------|
| | | | | |

3. Total Payment Due at Inception:
☐ Capitalized Cost Reduction ☐ Delivery Charge
☐ Trade-in Allowance ☐ Registration Fees
☐ Advance Monthly Payment of _____
☐ Refundable Security Deposit ☐ _____ $_____

4. Term of this lease:
The first monthly payment of $_____ is due on _____; _____ subsequent payments of $_____ on the _____ of each month thereafter.

5. Total Monthly Payment: $_____

6. Total of Monthly Payments: $_____

7. Total of Other Charges Payable to Lessor:
☐ Disposition $_____ ☐ Maintenance $_____
☐ _____ $_____ $_____

8. Fees and Taxes
Total amount you will pay during the term for official fees, registration, certificate of title, license fees and taxes. $_____

9. Insurance
The following types and amounts of insurance will be acquired in connection with this lease:

☐ We (lessor) will provide the insurance coverage quoted above for a total premium cost of $_____.
☐ You (lessee) agree to provide insurance coverage in the amounts and types indicated above. $_____

10. Standards for Wear and Use
The following standards are applicable for determining unreasonable or excessive wear and use of the leased vehicle: _____
_____
_____
_____

11. Maintenance
[You are responsible for the following maintenance and servicing of the leased vehicle: _____
_____
_____ ]

[We are responsible for the following maintenance and servicing of the leased vehicle: _____
_____
_____ ]

Appendix C

12. Warranties
The leased vehicle is subject to the following express warranties: _____
_____
_____

13. Early Termination and Default
(a) You may terminate this lease before the end of the lease term under the following conditions:_____
_____
_____

The charge for such early termination is _____
_____
_____

(b) We may terminate this lease before the end of the lease term under the following conditions: _____
_____
_____

Upon such termination we shall be entitled to the following charge(s) for _____
_____
_____

(c) To the extent that these charges take into account the value of the vehicle at the end of the lease term, if you disagree with the value we assign to the vehicle, you may obtain at your own expense, from an independent third party agreeable to both of us, a professional appraisal of the _____ value of the leased vehicle which could be realized at sale. The appraised value shall then be used as the actual value.

14. Security Interest
We reserve a security interest of the following type in the property listed below to secure performance of your obligations under this lease: _____
_____
_____

15. Late Payments
The charge for late payments is _____
_____

16. Lessee's Option to Purchase
[You have an option to purchase the leased vehicle at the following times: _____
_____
If at the end of the term, the price will be $_____.
If prior to the end of the term, the price will be $ _____
_____]

[You have no option to purchase the leased vehicle.]