Lorraine J. PETTOLA, Plaintiff,

v.

NISSAN MOTOR ACCEPTANCE
CORP., Defendant.

No. 3:98CV2108 (GLG).

United States District Court,
D. Connecticut.

April 9, 1999.

Bernard T. Kennedy, Branford, CT, for plaintiff.

William J. O'Sullivan, Baker & Fulco, P.C., Wethersfield, CT, for the defendant, Nissan Motor Acceptance Corp.

## OPINION

GOETTEL, District Judge.

This single-count complaint is brought under the Consumer Leasing Act, 15 U.S.C. §§ 1667–1667f ("CLA"). The lease in question is a Closed–End[1] Motor Vehicle Lease Agreement dated February 28, 1995 ("Lease"), pursuant to which plaintiff leased a 1995 Infiniti J30 from George Harte Nissan, Inc., d/b/a George Harte Infiniti.[2] The Lease was then assigned to defendant Nissan Motor Acceptance Corp. ("NMAC"). On or about July 14, 1997, plaintiff effected an early termination of the Lease and returned the vehicle. In this action against NMAC, plaintiff alleges various violations of the CLA and Regulation M, 12 C.F.R. §§ 213.1–213.8, promulgated thereunder, with respect to the disclosures she received concerning the lease terms. Pursuant to Rules 12(b)(1) and 12(b)(6), Fed.R.Civ.P., NMAC asks this Court to dismiss the complaint on the grounds that plaintiff's action is barred by the applicable statute of limitations, 15 U.S.C. § 1667d(c), and that the CLA does not apply because the "total contractual obligation" under the Lease was in excess of $25,000. See 15 U.S.C. § 1667(1).

## I. Rule 12(b)(1)—Subject Matter Jurisdiction

This Court's subject matter jurisdiction is invoked pursuant to the jurisdictional provision of the CLA, which provides that "any action under this section may be brought in any United States district court." 15 U.S.C. § 1667d(c). Defendant asserts that this action does not arise under the CLA because the Lease in question was not a "consumer lease," as that term is defined by the CLA, 15 U.S.C. § 1667(1), in that the "total contractual obligation" under the Lease exceeded $25,000. The CLA applies only to "consumer

---

**1.** In a "closed-end" lease, sometimes referred to as a "walk-away" lease, the lessee is not responsible for the residual value of the leased property at the end of the lease term. Official Staff Commentary, 12 C.F.R., pt. 213, supp. I, § 213.2, cmt. 2(d)–1. Thus, it is the lessor that assumes the risk by guaranteeing the residual value of the leased vehicle at the end of the lease term. See M & M Leasing Corp. v. Seattle First Nat'l Bank, 563 .F.2d 1377, 1379 (9th Cir.1977), cert. denied, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978).

**2.** George Harte Nissan, Inc., was formerly a defendant in this action but was dismissed with prejudice by stipulation of the parties on February 15, 1999.

leases," "for the use of personal property by a natural person for a period of time exceeding four months, and for a *total contractual obligation not exceeding $25,000*, primarily for personal, family, or household purposes...." *Id.* (emphasis added). Because NMAC's challenge to our subject matter jurisdiction bears upon this Court's "very power to hear the case," 2 James W. Moore, *Moore's Federal Practice,* § 12.30[1] (3d ed.1998) (citing *Bell v. Hood,* 327 U.S. 678, 682–83, 66 S.Ct. 773, 90 L.Ed. 939 (1946)), we must first address the Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. *See United States ex rel. Kreindler & Kreindler v. United Technologies Corp.,* 985 F.2d 1148, 1155–56 (2d Cir.), *cert. denied,* 508 U.S. 973, 113 S.Ct. 2962, 125 L.Ed.2d 663 (1993). Additionally, we note that, in ruling on a Rule 12(b)(1) motion, we need not confine our consideration to the face of the pleadings but may consider matters outside the pleadings. *See* 2 *Moore's Federal Practice,* at § 12.30[3]. Both parties have submitted additional materials, which we will consider in ruling on the issue of whether the CLA applies to the Lease at issue.

This seemingly straight-forward question, whether the "total contractual obligation" under the Lease exceeded $25,000, presents an issue of first impression in this Court and hinges on our interpretation of a phrase in the CLA that was never defined by Congress and that appears nowhere else in the United States Code. In this case, the Lease provided for an initial cash payment of $2,000.00, and 36 monthly payments of $625.08, for a total of $24,502.88. Additionally, the Lease called for payment of a title fee/initial registration fee of $130.00, sales tax of $125.94, a bank fee of $450.00, and a documentation fee of $99.00, for a total of $25,307.82. NMAC contends that $25,307.82 represents the "total contractual obligation" under the Lease and, therefore, the CLA does not apply. Plaintiff, however, relies on the Federal Reserve Board Official Staff Commentary to Regulation M, 12 C.F.R., pt. 213, supp. I, § 213.2, cmt. 2(e)–3, which states that the "total contractual obligation is not necessarily the same as the total of payments disclosed under § 213.4(e)."[3] It includes "nonrefundable amounts a lessee is contractually obligated to pay to the lessor, but *excludes* items such as: (i) Residual value amounts or purchase-option prices; (ii) *Amounts collected by the lessor but paid to a third party, such as taxes, licenses, and registration fees.*" (Emphasis added). Based upon this definition, plaintiff contends that the registration fee of $117.50[4] paid to the State of Connecticut, the sales tax of $125.94 paid to the State, and the $450.00 bank fee should be deducted as items collected by the lessor but paid to third parties. With these deductions, plaintiff contends that the "total contractual obligation" was $24,614.87, which falls below the critical $25,000 threshold, thus rendering the Lease subject to the CLA. Defendant NMAC responds that the Official Staff Commentary should not control because it was promulgated after the subject Lease and, therefore, does not apply.

**3.** 12 C.F.R. § 213.4(e) defines "total of payments" as the amount the lessee will have paid by the end of the lease, which includes the amount due at lease signing (less any refundable amounts), the total amount of periodic payments (less any amount of periodic payments paid at lease signing), and other charges listed in section 213.4(b), (c) and (d). Subsection (b) lists the following items as part of the "amount due at lease signing:" refundable security deposits, advance monthly or other periodic payment, and capitalized cost reduction. Subsection (c) pertains to the total amount of the periodic payments. Subsection (d) discusses "other charges," including the amount of any liability the lease imposes on the lessee at the end of the lease term. The potential difference between the residual and realized values is excluded, however.

**4.** The Lease reflected a registration/title fee of $130.00. Plaintiff argues that the correct fee of $117.50 was fraudulently concealed from her. For purposes of plaintiff's argument on the calculation of the "total contractual obligation," we have deducted only the amount actually paid to the State, $117.50.

The legislative history of the CLA indicates that the CLA had its origins in recommendations made by the Federal Reserve Board in 1974 to address the fact that the existing Truth–in–Lending Act ("TILA") did not apply to leases (other than leases with an option to purchase at a nominal price), and, at the same time, leasing of consumer durables, especially automobiles, was becoming an ever-increasingly alternative to outright purchases. S.Rep. No. 94–590 (1976), *reprinted in* 1976 U.S.C.C.A.N. 431. The Federal Reserve Board therefore recommended aggregate cost disclosures before a consumer lease was consummated and in lease advertising in order to provide consumers with meaningful information about the component and aggregate costs of consumer leases so that they could make more informed choices. *Id.* In 1976, the Senate passed the Consumer Leasing Act of 1976, Pub.L. No. 94–240, which was codified as Chapter 5 of the Truth–in–Lending Act, 15 U.S.C. §§ 1601–1693r, Title I of the Consumer Credit Protection Act, to protect consumers against inadequate and misleading leasing information and to assure meaningful disclosure of lease terms. 15 U.S.C. § 1601(b); *see Wiskup v. Liberty Buick Co.*, No. 95 C 4885, 1996 WL 18896 (N.D.Ill. Jan.17, 1996).

In defining "consumer lease," the Senate bill employed the term "total contractual obligation." The House bill, called the "Truth in Leasing Act," used different phraseology, defining "consumer leases" as those leases that were for a "specified *rent* not exceeding $25,000." *See* H.R.Conf.

Rep. No. 94–872 (1976), *reprinted in* 1976 U.S.C.C.A.N. 442 (emphasis added) (discussing H.R.8835, 94th Cong. (1976)). The House eventually receded to the Senate version which is the current definition of "consumer lease" in the CLA. *Id.* Where the phrase "total contractual obligation" originated, or how the figure of $25,000 was chosen, or how it was to be calculated, is not disclosed in the reported legislative history.[5] However, we agree with the two courts that have considered this issue that the legislative history would seem to indicate that Congress contemplated something more than rent by use of the phrase "total contractual obligation." *See Sanders v. Gold Key Lease, Inc.*, 906 F.Supp. 197, 200–201 (S.D.N.Y. Nov.22, 1995); *Easterwood v. General Elec. Capital Auto Lease, Inc.*, 825 F.Supp. 306 (N.D.Ga. 1993).

Although Congress did not define the term "total contractual obligation," it did confer upon the Federal Reserve Board the authority to "prescribe regulations to update and clarify the requirements and definitions applicable to lease disclosures and contracts, and any other issues specifically related to consumer leasing, to the extent that the Board determines such action to be necessary...." 15 U.S.C. § 1667f(a)(1). Following the passage of the CLA on March 23, 1976, the Federal Reserve Board initially expanded the old Regulation Z to cover the CLA.[6] In 1981, the Federal Reserve Board adopted Regulation M, 12 C.F.R. §§ 213, 46 Fed.Reg. 20949 (1981), which contained the new leasing rules and disclosure requirements.

---

**5.** It is interesting to note that one of the examples cited in the Senate Report is a "typical two-year auto lease on a $5,400 car." S.Rep. 94–590, *supra.* While automobile prices are not typically matters for judicial notice, this Court can state unequivocally that car prices have risen significantly since 1976 when the CLA was enacted and that, while $25,000 would have been the price for a very "high-end" vehicle in 1976, that is not the case today. Indeed, according to the April, 1999 issue of *Consumer Reports*, there is not a single new car that lists for anything close to

$5,400. *See Profiles of the 1999 Cars,* 64 Consumer Reports, Apr. 1999, at 32.

**6.** Regulation Z was originally promulgated under TILA. The provisions of the old Regulation Z which addressed consumer leasing were sections 226.2, 226.3, 226.6, 226.10, 226.15, and formal Board Interpretation sections 226.1501, 1502, and 1503. John G. Cooluris & Richard B. Wagner, *Consumer Leasing: An Overview of Current Law, Proposals for Change, and Other Developments,* 354 PLI/Comm 393 (June 1, 1985).

However, although Regulation M defined "consumer lease," 12 C.F.R. 213.2(a)(6), it did not shed light on the calculation of "total contractual obligation," the critical component in the definition of "consumer lease." Subsequent Official Staff Commentary from the Federal Reserve Board in 1982 was similarly unavailing, *see* 47 Fed.Reg. 20553 (1982), until October 1996, when Regulation M was revised, effective April 1, 1997. 62 Fed.Reg. 16054 (1997). The new Official Staff Commentary to the revised Regulation M indicated for the first time that "total contractual obligation" excluded "amounts collected by the lessor but paid to a third party, such as taxes, licenses, and registration fees." 62 Fed.Reg. 16058, cmt. 2(e)–3.

The Lease in question was signed February 28, 1995, prior to the above-cited Official Staff Commentary. At that time, neither the CLA nor Regulation M defined the phrase "total contractual obligation," and only one reported decision had addressed the definition of "total contractual obligation." In *Easterwood,* 825 F.Supp. at 309, the court held that a non-refundable downpayment must be added to the total monthly payments under an automobile lease for purposes of calculating the "total contractual obligation." The *Easterwood* court, however, was not faced with the issue presented here, that being whether to include amounts collected by the lessee for a third party.

Subsequent to the execution of the instant Lease and prior to the promulgation of the Official Staff Commentary on which plaintiff relies, the case of *Sanders,* 906 F.Supp. 197, was decided. In *Sanders,* the court considered each payment made at the inception of the lease to determine whether it should be included in calculating the "total contractual obligation." 906 F.Supp. at 201. Again, relying on the House's deferral to the Senate's phraseology "total contractual obligation" in lieu of the term "rent," the court held that the downpayment (also called the "capitalized cost reduction") and the disposition fee due

at the end of the lease (if plaintiff chose not to buy the vehicle) must be included in calculating the "total contractual obligation." *Id.* The court did not, however, address the title, license and registration fees or the taxes paid at the lease's inception, although the court did state in a footnote that taxes on the periodic payments should be included. *Id.* at 201, n. 10.

We have found no other case addressing the issue at hand. Neither of the above-cited cases is directly on point and, of course, neither had the benefit of the Official Staff Commentary. Now with the benefit of the Official Staff Commentary, we view the critical issue in the instant as whether it should be applied retroactively to define "total contractual obligation."

In *Murphy v. Empire of America, FSA,* 746 F.2d 931 (2d Cir.1984), a case brought under TILA, the Second Circuit held that absent some "obvious repugnance to the statute," the Federal Reserve Board's implementing regulations under TILA should be accepted by the courts, and that Board staff opinions construing TILA or the Regulations should likewise be considered dispositive unless "demonstrably irrational." 746 F.2d at 933 (citing *Anderson Bros. Ford v. Valencia,* 452 U.S. 205, 219, 101 S.Ct. 2266, 68 L.Ed.2d 783 (1981), and *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980)); *see also Ives v. W.T. Grant Co.,* 522 F.2d 749, 755 (2d Cir.1975) (recognizing the "undenied expertise"of the Federal Reserve Board in matters concerning TILA and giving the Board's interpretation of TILA "considerable deference"); *Cowen v. Bank United of Texas, FSB,* 70 F.3d 937, 943 (7th Cir.1995) (holding that "great weight" must be given to the Federal Reserve Board Official Staff commentary under TILA and applying it retroactively to an earlier transaction); *Fairley v. Turan–Foley Imports, Inc.,* 65 F.3d 475, 479 (5th Cir.1995) (noting that the expansive authority given by Congress to the Federal Reserve Board to promulgate reg-

ulations to carry out the purposes of TILA was the authority normally given to administrative agencies). Other courts have held that a distinction should be drawn between agency commentary that is interpretative, clarifying an unsettled area of law but not changing the law, and commentary that represents a substantive change in the law and which should not be applied retroactively. *McPhillips v. Gold Key Lease, Inc.,* 38 F.Supp.2d 975, 979 (M.D.Ala.1999); *Hickey v. Great Western Mortgage Corp.,* No. 94 C 3638, 1995 WL 317095, at *2 (N.D.Ill. May 23, 1995) (recognizing a difference between an administrative rule that changes the law and one which clarifies an unsettled or confusing area of the law). In this case, the Official Staff Commentary was clearly interpretive. It did not change the law. It did not require new disclosures. It simply clarified or defined a phrase that somehow had remained undefined since the passage of the CLA.

 Given the interpretive nature of the Board's commentary and the Second Circuit's counsel that the Board's regulations as well as the Staff Commentary are to be considered dispositive unless "demonstrably irrational," we hold that the Staff Commentary should be applied retroactively. This result is not "demonstrably irrational." Plaintiff's Lease was certainly the type of lease the CLA was designed to address. The CLA sought to provide a prospective lessee with meaningful disclosures concerning all of the charges associated with the lease so that he or she could compare the costs of leasing alternatives. The registration and license fees and the taxes paid to the State of Connecticut on a 1995 Infiniti J30 would presumably be the same regardless of the lessor. In other words, these were not costs within the control of the lessor. So, while these

items had to be disclosed, *see* 15 U.S.C. § 1667a, we find that it is not "demonstrably irrational" for the Board to have excluded them in the computation of the "total contractual obligation."

 Moreover, the CLA is remedial legislation that should be liberally construed to effectuate its underlying purpose.[7] *See N.C. Freed Co., v. Board of Governors of Fed. Reserve Sys.,* 473 F.2d 1210 (2d Cir.) (holding that TILA is remedial in nature and its terms must be construed in liberal fashion), *cert. denied,* 414 U.S. 827, 94 S.Ct. 48, 38 L.Ed.2d 61 (1973); *Fairley,* 65 F.3d at 479 (holding that, consistent with its purpose, TILA must be construed liberally in favor of the consumer); *Frazee v. Seaview Toyota Pontiac, Inc.,* 695 F.Supp. 1406, 1409 (D.Conn.1988) (holding that, since TILA is a remedial statute, it is interpreted strictly in favor of the consumer); *Gaydos v. Huntington Nat'l Bank,* 941 F.Supp. 669, 675 (N.D.Ohio 1996) (holding that, in interpreting CLA, courts should borrow TILA definitions, damage provisions, and general rules of construction); *Wiskup,* 1996 WL 18896, at *2 (same). Thus, we hold that the amounts collected by the lessor for a third party will not be included in the "total contractual obligation," and we deny defendant NMAC's motion to dismiss for lack of subject matter jurisdiction.

## II. Rule 12(b)(6)—Statute of Limitations

The CLA contains its own statute of limitations, which provides that "actions alleging a failure to disclose or otherwise comply with the requirements of this part shall be brought within one year of the termination of the lease agreement." 15 U.S.C. § 1667d(c). Defendant asserts that the undisputed facts show that plaintiff terminated her Lease on July 14, 1997, but

---

7. This Court has generally adopted a very strict approach in construing federal grants of jurisdiction. Indeed, we have recently expressed our dismay at the large number of small cases over which Congress has given the federal courts jurisdiction. *See Murphy v.*

*Equifax Check Services, Inc.,* 35 F.Supp.2d 200 (D.Conn.1999). However, this case presents a rather unique situation where the statute sets a ceiling rather than a floor on the amount required for the exercise of federal jurisdiction.

did not file this action until October 29, 1998, more than three months after the statute of limitations had run. Plaintiff does not dispute the applicability of this one-year limitations period but claims that her action was timely because the Lease by its terms was a 36–month lease that did not end until February 28, 1998, thus giving plaintiff until February 28, 1999, to file this action. Alternatively, she argues that her claim was tolled under the doctrines of equitable tolling and fraudulent concealment.

## A. The Statute of Limitations Period

■ The limitations period in the CLA refers to the "termination" of the lease, not to the expiration of the term set forth in the lease agreement. An automobile lease may terminate prior to the expiration of the full lease term for a variety of reasons. *See, e.g., Kedziora v. Citicorp Nat'l Serv., Inc.*, 844 F.Supp. 1289, 1292 (N.D.Ill.1994) (finding that a default occurred when a car was totally destroyed in an accident, thus triggering the early termination of the lease). This is why a lease, such as the subject Lease, is required to contain disclosures regarding "early termination." *See* 15 U.S.C. § 1667a(11); Regulation M, 12 C.F.R. § 213.4(g); Lease at ¶ 17. In this case, the Lease was terminated by virtue of plaintiff's failure to make the required rental payments and her voluntary surrender of the automobile to the dealer on July 14, 1997, at which time plaintiff signed a "Federal Odometer/*Lease Termination* Statement." (Emphasis added). Indeed, one of the allegations of plaintiff's complaint is that defendant failed to follow the terms of the Lease upon early *termination* of the Lease. (Compl. at ¶¶ 12, 13). We find that the Lease was terminated, and the statute of limitations began to run, on July 14, 1997.

## B. Equitable Tolling and Fraudulent Concealment

Plaintiff argues, however, that under the doctrines of equitable tolling and fraudu-

lent concealment, the statute of limitations was tolled. Specifically she raises two claims of fraudulent concealment. First, she alleges that defendant fraudulently concealed the amount of money that was actually paid to the State of Connecticut for the title and registration of her vehicle (plaintiff alleges that she was overcharged $12.50 for the registration/title). *See* Note 4, *supra*. Second, she claims that defendant misrepresented the amount of money that it was seeking as damages for plaintiff's early termination of the lease.

### 1. Is the CLA Limitations Period Subject to Equitable Tolling?

■ We begin by considering whether the one-year statute of limitations of the CLA is subject to equitable tolling. Under the federal equitable tolling doctrine, the active concealment of fraudulent conduct tolls the statute of limitations in favor of the defrauded party until such time as he or she actually knew of the fraudulent conduct. *See Atlantic City Elec. Co. v. General Elec. Co.*, 312 F.2d 236, 239 (2d Cir.1962) (*en banc*), *cert. denied*, 373 U.S. 909, 83 S.Ct. 1298, 10 L.Ed.2d 411 (1963). Equitable tolling prevents the running of a statute of limitations against a plaintiff who is unaware that he or she has a cause of action because of the defendant's fraudulent acts or concealment. *Bennett v. United States Lines, Inc.*, 64 F.3d 62, 66 (2d Cir.1995).

■ As a general rule, the doctrine of equitable tolling is read into every federal statute of limitations. *Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 90 L.Ed. 743 (1946). The Second Circuit has declared that this "policy is so strong that it is applicable unless Congress expressly provides to the contrary in clear and unambiguous language." *Atlantic City Elec.*, 312 F.2d at 241.

We have found no case deciding this precise issue under the CLA. However, there are a number of cases that have held that the one-year limitations period of

TILA, 15 U.S.C. § 1640(e),[8] is not jurisdictional and is subject to equitable tolling. *See, e.g., Ellis v. General Motors Accceptance Corp.*, 160 F.3d 703, 706 (11th Cir. 1998); *Ramadan v. Chase Manhattan Corp.*, 156 F.3d 499, 505 (3d Cir.1998); *King v. California*, 784 F.2d 910, 914–15 (9th Cir.1986); *Jones v. TransOhio Sav. Ass'n*, 747 F.2d 1037, 1041 (6th Cir.1984); *Evans v. Rudy–Luther Toyota, Inc.*, 39 F.Supp.2d 1177, 1181 (D.Minn.1999); *see also Moll v. U.S. Life Title Ins. Co. of New York*, 700 F.Supp. 1284, 1289 (S.D.N.Y. 1988) (holding that the limitation period under the Real Estate Settlement Procedures Act of 1974 was subject to equitable tolling). These cases have looked primarily to the remedial purpose underlying TILA in protecting consumers against fraudulent credit practices. As the Eleventh Circuit stated in *Ellis,*

> if we were to read its time limit literally, consumers whose cause of action was fraudulently concealed from them until a year had passed could not pursue a cause of action under TILA. That would lead to the anomalous result that a statute designed to remediate the effects of fraud would instead reward those perpetrators who concealed their fraud long enough to time-bar their victims' remedy. We cannot believe this was Congress' intent.

160 F.3d at 708. Put another way, "it would border on perverse for us to hold that a consumer's opportunity to file suit, under what is in large part an antifraud statute, would not be preserved by the doctrine of fraudulent concealment—a doctrine that is directed at the same class of turpitude." *Evans*, at 1183.

**8.** The one-year statute of limitations under TILA runs from the date of consummation of the transaction, 15 U.S.C. § 1640(e), and not from the termination of the transaction, as under the CLA.

**9.** Section 1667d(c), "Jurisdiction of courts; time limitation," provides in full:
> *Notwithstanding section 1640(e)* of this title, any action under this section may be

Defendant asserts that the policy reasons underlying the cases decided under TILA should not apply to the CLA because section 1667d(c) specifically states that section 1640(e) should not apply.[9] We disagree with defendant's interpretation. Rather, we believe that a more logical reading of the "[n]otwithstanding section 1640(e)" language is that it references the difference in the limitations periods for bringing an action. Under section 1640(e), the statute of limitations runs from the date of the occurrence of the violation, which would generally be the time the disclosure was made. *See Goldman v. First Nat'l Bank of Chicago*, 532 F.2d 10, 17 (7th Cir.), *cert. denied*, 429 U.S. 870, 97 S.Ct. 183, 50 L.Ed.2d 150 (1976). Thus, the statute of limitations might well have run before the conclusion of the credit transaction. On the other hand, under the CLA, the one-year period runs from the termination of the lease, which in a three- or four-year vehicle lease would mean that the lessee would have four or five years, respectively, from the time the original lease was signed to file suit under the CLA. Accordingly, we find that the most logical reading of the phrase "[n]otwithstanding section 1640(e)," is that it references the different limitations periods.

We do not view the underlying policies of TILA and the CLA as different. Both are remedial statutes, which are to be given a liberal interpretation in favor of the consumer, and both have similar purposes. *See* 15 U.S.C. § 1601(a) and (b). The CLA was enacted as an amendment to TILA and has been construed in the same manner as TILA. *See Gaydos*, 941 F.Supp. at 675 (holding that, in interpreting CLA, courts should borrow TILA definitions,

brought in any United States district court or in any other court of competent jurisdiction. Such actions alleging a failure to disclose or otherwise comply with the requirements of this part shall be brought within one year of the termination of the lease agreement.
15 U.S.C. § 1667d(c) (emphasis added).

damage provisions, and general rules of construction); *Wiskup,* 1996 WL 18896, at *2 (same). Thus, we reject defendant's argument. We find persuasive the reasoning of those cases interpreting TILA and hold that the one-year CLA statute of limitations is subject to equitable tolling due to fraudulent concealment.

### 2. Does Equitable Tolling Apply in this Case?

■ For the Federal common-law doctrine of fraudulent concealment to apply, plaintiff must show: (1) that defendant engaged in a course of conduct to conceal evidence of the defendant's alleged wrongdoing; and (2) that plaintiff failed to discover the facts giving rise to her claim despite her exercise of due diligence. *See City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 460 (2d Cir.1974); *Jones v. Saxon Mortgage, Inc.,* 980 F.Supp. 842, 846 (E.D.Va.1997), *aff'd,* 161 F.3d 2 (4th Cir. 1998) (table decision). In TILA cases, the courts have held uniformly that fraudulent conduct beyond the nondisclosure itself is necessary to equitably toll the running of the statute of limitations. *Evans,* at 1184; *Jones,* 980 F.Supp. at 846; *Kicken v. Valentine Prod. Credit Ass'n,* 628 F.Supp. 1008, 1011 (D.Neb.1984), *aff'd,* 754 F.2d 378 (8th Cir.1984) (table decision); *Hughes v. Cardinal Fed. Sav. & Loan Ass'n,* 566 F.Supp. 834, 838 (S.D.Ohio 1983). The burden is on plaintiff to show not only that she failed to discover her cause of action prior to the running of the statute of limitations, but also that she exercised due diligence and that some act of fraudulent concealment frustrated discovery notwithstanding such diligence. *City of Detroit,* 495 F.2d at 461.

■ We apply these standards to plaintiff's first ground for tolling the statute of limitations—that defendant failed to

disclose the true amount being paid to the State of Connecticut for registration and title fees. Plaintiff has failed to allege any facts that would establish her due diligence in attempting to ascertain this nondisclosure within the limitations period. Plaintiff has also not alleged anything that was done by defendant to prevent her from discovering this fact. *See Campbell v. Chandler Assoc., Inc.,* No. 95–CV–1770, 1997 WL 151889, at *2 (N.D.N.Y. Mar.28, 1997). We note that this alleged nondisclosure occurred in February, 1995, when the Lease was signed, and that the statute of limitations did not run until July 14, 1998. Plaintiff had over three years to discover this alleged fraud. We have no difficulty finding that the alleged nondisclosure of the correct fee paid to the State did not equitably toll the running of the statute of limitations.

■ In support of plaintiff's second argument that defendant fraudulently concealed from her the amount of damages it was seeking as early termination charges, plaintiff relies on two letters attached to her opposition to the motion to dismiss.[10] The first is a letter from NMAC dated June 16, 1997, which responds to her inquiry regarding the amount due to terminate her Lease prior to maturity. The letter states that the amount is $5,417.53, which must be paid and the vehicle turned in before 07/01/97. Apparently, this sum was not paid, and we know that the vehicle was not turned in until July 14, 1997. On September 10, 1998, the law firm of Howard Lee Schiff, P.C., wrote plaintiff stating that the balance due was $13,144.53. The letter provides no explanation as to how that figure was computed. Plaintiff had also received a Notice of Intent to Sell Vehicle, dated 08/08/97, which indicated that the total amount required to redeem the vehicle as of the date of the notice was $28,061.67. The notice further stated: "In

---

**10.** Under Rule 12(b), if a motion to dismiss for failure of the pleading to state a claim upon which relief may be granted, "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all materials pertinent to such a motion by Rule 56." Rule 12(b), Fed.R.Civ.P.

the event you do not REDEEM your vehicle, the REALIZED VALUE of the vehicle will be established in accordance with the terms of your lease. In the event the vehicle's REALIZED VALUE is insufficient to cover your Adjusted Lease Balance, plus the costs of repossession and any other amounts owed, you will owe the difference to us." While these different figures may be confusing, plaintiff has offered no evidence in support of her claim of that defendant fraudulent concealed from her the early termination fees. If it turns out that the figures sought by the law firm of Howard Lee Schiff, P.C., are incorrect, plaintiff still has available to her the defense that these were not calculated in accordance with the Lease terms. However, to the extent that she had a claim under the CLA for nondisclosure of early termination charges, that claim had to be asserted within one year of the termination of the Lease. This plaintiff failed to do. Plaintiff must establish fraudulent conduct on the part of defendant beyond the nondisclosure itself to equitably toll the running of the statute of limitations. Plaintiff has failed to show that defendant did anything to fraudulently conceal this claim from her.

Accordingly, we hold that the statute of limitations was not tolled and that plaintiff's claims under the CLA are time-barred.

### Conclusion

For the reasons set forth above, we GRANT the Motion to Dismiss of Defendant Nissan Motor Acceptance Corp. [**Doc. # 13**] on statute of limitations grounds. The Clerk is directed to enter judgment in favor of defendant Nissan Motor Acceptance Corp. and close this case.

SO ORDERED.