**Igli DAUTI and Alicja Dauti,**

**v.**

**HARTFORD AUTO PLAZA, LTD d/b/a Hartford Toyota Superstore.**

**CIV. No. 399CV994(HBF).**

United States District Court, D. Connecticut.

June 4, 2002.

Daniel S. Blinn, Rocky Hill, CT, James L. Fischer, Hartford, CT, Matthew T. Theriault, for plaintiffs.

Lawrence J. Kiel, Farmington, CT, Margaret Fogerty Rattigan, for defendants.

## BENCH RULING

FITZSIMMONS, United States Magistrate Judge.

Igli and Alicja Dauti bring this action for damages against Hartford Auto Plaza, Ltd, d/b/a Hartford Toyota Superstore ("Hartford Toyota"). They seek actual damages, statutory damages, punitive damages and attorney's fees, pursuant to the Consumer Leasing Act ("CLA"), 15 U.S.C. §§ 1667–1667f. Plaintiffs also allege state law claims of breach of contract, fraud, and violation of the Connecticut's Unfair Trade Practices Act, ("CUTPA"), Conn. Gen.Stat. §§ 42–110a–q. Jurisdiction is premised on 28 U.S.C. §§ 1331 and 1337.

A bench trial was held on December 10–11, 2001. Alicja Dauti[1], Igli Dauti, and Julian Anthony Martinez, finance manager of the Hartford Toyota Superstore testified in plaintiff's case and Richard McAllister, general manager and vice president of Hartford Auto Plaza, Ltd., testified on behalf of defendant.

Testimony and evidence adduced at the hearing are summarized below as necessary to explain the Court's findings and conclusions.

## FINDINGS OF FACT

Based on the credible testimony, the exhibits, and the entire record compiled during the trial[2], the Court finds established the following facts which are relevant to this ruling.

## Background

The plaintiffs, Igli and Alicja Dauti, are individuals residing in Hartford, Connecticut. Igli Dauti immigrated to the United States from Albania in 1997. Alicja Dauti was born in Paris and raised in Poland. She met Igli Dauti during summer vacation in 1997, in Hartford. She returned to the United States in 1998 and married him. Plaintiffs' first language is Polish.[3] In spring 1999, plaintiffs worked as a waitress and a waiter at area restaurants. In April 1999, Alicja Dauti was 21 years old and Igli Dauti was 20 years old.

Hartford Toyota is engaged in the business of selling and leasing new and used cars to the public, with its principal place of business in Hartford.

In March 1999, the Dautis were shopping to lease or purchase a 4 X 4 vehicle. After failing to gain approval in March 1999 to lease a new Nissan Pathfinder at Hart Nissan, plaintiffs testified that they continued to shop for a 4 X 4 at area dealerships.

## April 1, 1999

On Thursday, April 1, 1999, plaintiffs test drove a 1996 Toyota 4–Runner at Hartford Toyota. Plaintiffs discussed financing options with Julian Anthony Martinez, finance manager of the Hartford Toyota Superstore. After discussion with Mr. Martinez, the Dautis decided to lease, rather than purchase, the 4–Runner.

Mr. Martinez presented plaintiffs with a lease for a used 1996 Toyota 4–Runner, VIN # JT3HN87R5T0015609 (the "vehi-

1. Alicja and Igli Dauti were married at the time of the events at issue in this lawsuit. They have since divorced and Alicja Dauti has resumed the use of her maiden name, Alicja Brusik. For clarity, the Court will refer to Ms. Brusik as Alicja Dauti in this ruling.

2. Prior to trial, the parties stipulated to certain facts, which are listed in the Joint Pre-

trial Memorandum [Doc. # 38], and cited in this opinion as "Stip."

3. Igli Dauti testified that his English was "not great" in April 1999, and his wife's English was better than his. He stated he had a hard time reading the paperwork.

cle"), for a term of 36 months. [Stip. ¶ 1]. Mr. Martinez testified that in 1999 Hartford Toyota used Nations Bank for third party financing of used car leases. The form lease in this case has "Nations Bank" printed at the top. Paragraph 14 of the Lease, entitled "Signatures," contains the signatures of Igli Dauti and Alicja Dauti as Individual Lessees. Under Lessor Signature, the Lease states,

> The authorized signature of the Lessor below has the effect of: (1) accepting the terms and conditions of this Lease; and (2) assigning all right, title and interest in and to the vehicle and this Lease, including all amounts to become due hereunder, to: NationsBanc Auto Leasing, Inc. 270 South Service Road, Melville, N.Y. 11747–0570 and its successors and assigns subject to and in accordance with the terms and conditions of the separate Dealer Agreement between Lessor and Assignee.

[Pl.Ex. 1]. It is undisputed that the lease was not signed by a representative of Hartford Toyota. [Pl.Ex. 1, ¶].

Section 3 states that the amount due at lease signing or delivery is $3,045.15. Section 4, "Monthly Payments," indicates that $377.81 is due on April 1, 1999, followed by 35 payments of $377.81 due on the 1st of each month, with total monthly payments of $13,601.16. Section 7, "Itemization of Amount due at Lease signing or Delivery," reflects that the total due as $3,045.15.

Plaintiffs testified that they filled out a Credit Application and were told by Mr. Martinez that they were "approved." The parties disagree on the language used by Mr. Martinez at this stage of the transaction. Mr. Martinez testified that he told plaintiffs "everything looked good." He testified that the lease was not signed because it was contingent on approval

from Nations Bank, which was never received.

Plaintiffs signed the lease and made a $3,000 down payment, splitting the charges on two credit cards. [Stip. ¶ 2; Pl.Ex. 2, 3, 4, 10]. Martinez testified that, although the lease agreement stated that plaintiff's owed $3,045.15, Hartford Toyota would have paid the additional $45.15 if Nations Bank accepted the lease. Martinez testified that he was not authorized by Hartford Toyota to sign leases and that a representative of Hartford Toyota signs lease agreements on behalf of Nations Bank only after the Bank approves the transaction. After approval, Nations Bank sends a payment coupon booklet directly to the Lessees, who send their payments directly to the Bank.

Hartford Toyota offers "spot delivery" to its customers. Under this plan, the dealership will release a car prior to finding Third Party financing.

Plaintiffs took possession of the vehicle on April 1 after executing a Delivery Sheet and obtaining a temporary registration, temporary license plate and car insurance.[4] *Id.* ¶ 3; Pl.Ex. 5, 6; Def. Ex. 501, 505. The Delivery Sheet, dated April 1, 1999, states in relevant part

> THIS IS TO CONFIRM THAT HARTFORD TOYOTA WILL BE SUBMITTING YOUR CREDIT APPLICATION TO A LENDING INSTITUTION OF OUR CHOICE. IT IS ALSO UNDERSTOOD THAT IF CREDIT APPROVAL IS DECLINED, YOU ARE REQUESTED TO RETURN THE VEHICLE TO U.S. OR THE VEHICLE WILL BE SUBJECT TO REPOSSESSION.

.    .    .    .    .

---

4. Martinez testified that the temporary registration was never sent to the Department of

Motor Vehicles because the financing was never approved. [Def. Ex. 505].

THIS IS TO CONFIRM THAT YOU HAVE FULL COVERAGE AUTOMOBILE INSURANCE WITH THE NATION WIDE INSURANCE COMPANY. YOU ACCEPT FULL RESPONSIBILITY IN THE EVENT OF AN ACCIDENT OR THEFT INVOLVING THIS VEHICLE. IT IS ALSO UNDERSTOOD THAT THIS VEHICLE WILL BE ADDED TO YOUR INSURANCE POLICY WITHIN 72 HOURS.

Def. Ex. 501. Plaintiffs and defendant's representative, Mr. Martinez, signed the Delivery Sheet in two places. *Id.* Plaintiffs testified they were so excited about getting the 4–Runner that they did not read the documents that they signed. They agree that their signatures appear on the sheet in two places. Martinez testified that he read the lease and Delivery Sheet out loud to plaintiffs and asked them if they understood what they were signing.

During negotiations on April 1, Mrs. Dauti testified that she offered Hartford Toyota their 1993 Pontiac Grand–Am as a trade-in, but later declined Hartford Toyota's offer of $800, reasoning that they would be able to sell the car for more money on their own. Plaintiffs testified that they placed an advertisement in the Hartford Courant to sell the Pontiac. Although Mrs. Dauti testified that they placed an advertisement to begin running on April 10, 1999, no supporting documentation was offered into evidence. Mrs. Dauti testified the Pontiac was sold on April 12. No further testimony or documentary evidence was submitted to prove this sale.

It is undisputed that plaintiffs were unable to secure financing approval for the

lease from a third party and that plaintiffs declined to obtain an additional co-signer or to make an additional down payment. [Stip. ¶¶ 5–6]. Mr. Martinez testified that third party financing is rarely refused. He testified he was "very surprised" the Dautis were refused financing. The parties dispute when and how this was communicated. Plaintiffs declined to return the vehicle to Hartford Toyota as requested. [Stip. ¶ 7].

Mr. Martinez testified that on April 1 he faxed an application to Nations Bank at around 4:30 to 5 p.m. Martinez testified he told the Dautis that everything looked good but they would have to wait for approval. Nations Bank declined to finance the Dautis' lease, stating plaintiffs had "insufficient credit files." [Def. Ex. 504]. Plaintiffs' exhibit 504 is a fax transmission, dated April 1, 1999 at 6:06 p.m., from Nations Banc Auto Leasing, Inc. to Anthony Martinez. Martinez stated that he contacted Nations Bank and tried to get them to overturn their decision, that he tried to renegotiate terms that would get approval. Richard McAllister testified that Martinez sought assistance from other Hartford Toyota managers who had a better relationship with Nations Bank to get the deal to go through. He testified that "more money down or a co-sign will usually help the situation."[5] Martinez testified that he contacted the Dautis on April 14 or 15 to discuss the matter.[6] The Dautis were unable to come up with a larger down payment or a co-signer. Martinez testified that he explored financing for the lease of a new 4–Runner from April 14 through April 20. On April 15, 1999, Chase Automotive Finance and Toyota Motor Credit Corporation denied the Dautis financing to

---

**5.** The parties testified that Martinez suggested that $1,000 more down with a co-sign or an additional $2,000 down might help plaintiffs obtain financing.

**6.** Plaintiffs allege in the complaint that they were informed that their credit application was rejected on April 19, 1999. [Doc. # 1 ¶ 3]. Mr. Dauti testified that they were notified within two weeks, or April 14, 1999.

lease a 1999–4–Runner.[7] [Def. Ex. 502, 503].

It is undisputed that, during this time, Mr. Martinez called plaintiffs several times, as many as seven to eight times, to discuss other finance terms and that he requested they return the vehicle. The Dautis made two appointments with Martinez to return the car and then did not appear, after which Martinez contacted the Dautis to inform them that Hartford Toyota would pick up the car.

*April 26, 1999*

On April 26, 1999, the Toyota 4–Runner was repossessed by Hartford Toyota. [Stip. ¶ 8]. The vehicle had 1,100 additional miles since plaintiffs took possession of the vehicle on April 1.

Rich McAllister, General Manager and Vice President of Hartford Auto Plaza, Inc., testified that he has worked in the car business since 1984. He estimated that, of the approximately 180 to 220 cars Hartford Toyota sold per month, 10 to 20 percent-or 20 to 30 cars-are spot deliveries without lease approval. Mr. McAlister testified that the Dautis' car was the only spot delivery he has had to repossess since 1984.

Defendant's Exhibit 507 is an estimate from South Green Automotive provided to Igli Dauti, dated April 27, 1999, for various repairs and maintenance for a 1993 Pontiac Grand Am totaling $382.24. On cross examination, plaintiffs were unable to explain the inconsistency between this exhibit and their testimony that the car was sold by April 12. The Court credits Mr. Martinez' testimony that plaintiffs asked if they could use the Grand Am for a trade-in to secure financing after the car was repossessed. Martinez testified that Hartford Toyota offered plaintiffs $1,000 for the Pontiac but that they needed to increase their cash down payment by at least $2,000 to get financing.

On or about April 28, the Dautis met with Martinez to discuss whether they could reacquire the vehicle or obtain the return of their full $3,000 down payment. Defendant sought to retain some money for the use of the car and the increased mileage. [Pl.Ex. 7]. No agreement was reached.[8]

This was the Dautis' first experience in leasing or financing a car. Plaintiffs did not tell Hartford Toyota that they had been refused credit at Hart Toyota in March 1999.

Mrs. Dauti testified that she contacted her insurance company to cancel the insurance after April 26 but received no rebate. No documentary evidence was produced to support this testimony. Mr. Dauti testified that he did not know whether the new car they purchased on May 7, 1999, was insured under the same policy.

---

7. Chase Automotive Finance's reasons for turning down the lease were:
    (1) number of recent credit inquiries on credit bureau report;
    (2) insufficient average length of time credit accounts have been established;
    (3) insufficient income relative to loan amount requested;
    (4) number of bank and or national revolving credit accounts with high utilization. [Def. Ex. 502].
    Toyota Motor Credit Corporation also declined financing citing plaintiffs' "limited credit experience" ... "both [applicants] have limited minor revolving only. Neither qualify for this type of advance. Rejected." [Def. Ex. 503].

8. Plaintiff's Exhibit 7 indicates that defendant offered to return $2,500 "as full and final settlement of the lease contract" with the understanding that Hartford Toyota would keep $500 of the original deposit/down payment for the use of the car. [Pl.Ex. 7]. Plaintiffs did not sign the hand written agreement prepared by Martinez.

Plaintiffs seek compensation for the loss of a second car for two weeks. Mrs. Dauti testified that a rental car costs $45 per day and she considered renting a car but it was too expensive.[9] Plaintiffs did not submit a bill or receipt for the cost of a rental car. Plaintiffs also seek compensation for the inconvenience suffered by the loss of the 4–Runner. Mrs. Dauti testified that she either took a taxi or lost hours at work to drop off and pick up her husband; however, no time records or taxi receipts were offered in evidence.

The parties stipulate that, after plaintiffs hired an attorney, demand was made for the return of the $3,000 down payment. Hartford Toyota credited the Dautis' credit cards in the total amount of $3,000 on May 7, 1999. [Pl.Ex. 10]. On that day, plaintiffs purchased a new 4–Runner from another dealer. The car payments for the new car were approximately $600 per month.

On May 28, 1999, plaintiffs filed this lawsuit seeking statutory damages of $1,000 under the Consumer Leasing Act, the $45 per day cost for a rental car for two weeks during which they lost use of a second car ($630)[10]; $600 in insurance costs for 3 months[11]; attorneys fees[12] and punitive damages.

*DISCUSSION*

1. *Consumer Leasing Act*

Plaintiffs first argue that the lease violates § 1667 of the Consumer Leasing Act, because "Hartford Toyota did not accurately state the amount required to be paid at the lease's inception, but instead stated a higher amount and correspondingly increased the vehicle's capitalized cost in an effort to make it a wash." [Doc. # 53 at 1]. The lease stated that the amount due at signing was $3,045.15, when the actual amount plaintiffs paid was $3,000.

The Consumer Leasing Act ("CLA") is part of a larger statutory scheme known as the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601–1693r.

> The primary purpose of TILA is to promote the informed use of credit. 15 U.S.C. § 1601. The Act requires creditors to disclose credit terms in a uniform manner and by requiring all additional mandatory charges imposed by the creditor to be included in the computation of the finance charge, the consumer is given the information needed to compare the cost of credit and make an informed buying decision.

> Since TILA is a remedial statute, it is interpreted strictly in favor of the consumer.

*Frazee v. Seaview Toyota Pontiac, Inc.*, 695 F.Supp. 1406, 1408 (D.Conn.1988) (buyer brought suit, a year after financing, arguing that the difference between the fair market value of the car purchased and the amount paid reflect a hidden finance charge in violation of TILA). "One of the stated purposes for enacting TILA and CLA was to assure a meaningful disclosure of the terms of leases ... so as to enable the lessee to compare more readily the various lease terms available to him." *Lundquist v. Security Pacific Automotive*

---

9. From April 26 through May 7, or for twelve days, plaintiffs testified that they had neither the Toyota 4–Runner nor another second car. Mrs. Dauti testified that the Toyota was repossessed on April 26 and they purchased another car on May 7. The record does not establish that the Pontiac was already sold. No copy of the title transfer or a bill of sale was submitted into evidence to corroborate this testimony.

10. This claim of damages was not supported by documentation.

11. This claim of damages was not supported by documentation.

12. Mrs. Dauti testified she paid $500 in attorney's fees and costs to date. No time records from plaintiffs' attorney were submitted into evidence.

*Financial Services Corporation,* Civ. No. 5:91CV754, 1992 WL 475651, at *2 (D.Conn. June 9, 1992). TILA is "interpreted strictly in favor of the consumer." (citation omitted). "Technical violations of the disclosure provisions and penalty limitation of CLA support an award of statutory damages." *Id.* (citing 15 U.S.C. § 1667d (1982)). "Like the rest of the TILA, the CLA is a disclosure rather than regulatory statute." *Turner v. General Motors Acceptance Corp.,* 180 F.3d 451, 454 (2d Cir.1999) (citation omitted).

Plaintiffs argue that it does not matter that they actually paid less than the listed payment. The Court credits Martinez' testimony that, although the contract stated $3,045.15, Hartford Toyota agreed to accept $3,000 from plaintiffs and Hartford Toyota would have paid the $45.15 difference or waived it.

While CLA is concerned with ensuring full credit disclosure, the Act did not contemplate providing a right of action whenever a consumer was declined credit. "The CLA sought to provide a prospective lessee with meaningful disclosures concerning all of the charges associated with the lease so that he or she could compare the costs of leasing alternative." *Pettola v. Nissan Motor Acceptance Corp.,* 44 F.Supp.2d 442, 447 (D.Conn.1999). Plaintiffs do not challenge the Nations Bank Lease Agreement Form used by defendant. Defendant argues, and the Court agrees, that there has been no failure to disclose the charges payable by plaintiffs. *Turner,* 180 F.3d at 455 ("section 1667a(4) requires lessors to disclose, in addition to charges payable at lease inception and the amounts of all periodic payments, the amount of 'other charges payable by the lessee.' ").

■ Defendant argues that, whether the $45.15 was paid by defendant or waived, its inclusion does not constitute a CLA violation. Plaintiffs have made no showing that this $45.15, disclosed but not paid by plaintiff, contributed to Nations Bank's decision to decline credit. 15 U.S.C. § 1667a. Nor have plaintiffs identified any specific harm arising from the fact that a $3,045.15 charge was disclosed but that plaintiffs only paid $3,000.

Plaintiffs' claim is essentially that defendant finalized a lease agreement with them and then changed the terms, or as they argue under their claim for breach of lease, that defendant engaged in a "yo-yo" transaction. *See Frazee v. Seaview Toyota Pontiac, Inc.,* 695 F.Supp. 1406, 1408 (D.Conn.1988) (declining to find a TILA violation where plaintiff's claim "is in essence a claim in warranty."). The legislative history of the CLA indicates that the Federal Reserve Board "recommended aggregate cost disclosures before a consumer lease was consummated and in lease advertising in order to provide consumers with meaningful information about the component and aggregate costs of consumer leases so that they could make more informed choices." *Pettola,* 44 F.Supp.2d at 445 (citing S.Rep. No. 94–590 (1976), *reprinted in* 19 U.S.C.C.A.N. 431). Notwithstanding plaintiffs' claim in their post trial memorandum that "Hartford Toyota did not accurately state the amount required to be paid at the lease's inception, but instead stated a higher amount and correspondingly increased the vehicle's capitalized cost in an effort to make it a wash", [Doc. # 53 at 1], plaintiffs failed to demonstrate this at trial. Defendant provided plaintiffs with all the "information necessary to enable them to compare lease terms with other leases." *Turner,* 180 F.3d at 456 (citing 12 C.F.R. § 213.1(b)(1)). Here, plaintiffs made a slightly lower down payment with no corresponding increase in the total contractual obligation.[13]

---

**13.** Plaintiffs did not show any failure by defendants to disclose a charge payable by

Finally, the Court was not persuaded that there was a deliberate effort by defendant to mislead the Dautis. The Court was persuaded that Martinez wrote up the form first and, when the Dautis said they would only be able to pay $3,000, he agreed to it. The Court does not believe that such conduct rises to the level of a CLA violation. The Court has found no cases addressing this issue and the parties did not cite any cases on point. On this record, the Court finds no CLA disclosure violation.

### 2. *Breach of Contract*

*Yo–Yo Transactions*

Plaintiffs argue for the first time in their post-trial brief that defendant engaged in a "yo-yo" sales transaction designed to deceive them into thinking they had a deal for the purpose of later renegotiating terms unfavorable to them. In support, plaintiffs appended to their post-trial memorandum a copy of *Unfair and Deceptive Acts and Practices* (National Consumer Law Center) § 5.4.3 a (2000 Supp.), arguing that "[t]he evidence at trial established that plaintiffs suffered precisely this type of harm." [Doc. # 53 at 2]. After considering this submission, the Court concludes that plaintiffs did not establish by a preponderance of the evidence that defendant engaged in a "yo-yo" transaction and did not prove that defendants breached the contract.

▪ Plaintiffs first argue that the lease agreement is enforceable without defendant's signature. While it is undisputed that an authorized representative of Hartford Toyota did not sign the lease agreement, plaintiffs argue that "the filled in contract should be viewed as the dealer's offer, and the consumer's signature as acceptance, so the contract is binding." [Doc. # 53 at 3] (quoting *Deceptive Acts and Practices* § 5.4.3a.2.3). However, plaintiffs cite no case law to support the proposition that defendant's signature was unnecessary to execute the agreement. At trial, Martinez testified that the lease agreement would not be signed until financing was authorized and that plaintiffs were clearly notified by signing the Delivery Sheet that credit approval was a requirement before Hartford Toyota would enter into the lease. Perhaps Martinez minimized the likelihood that the Dautis would have to return the car. The Court credits Martinez' testimony that he genuinely believed plaintiffs would be approved for financing. Plaintiffs did not inform Martinez that they had not been approved to lease a Nissan Pathfinder a month earlier.

There is no dispute that both parties executed the Delivery Sheet. Plaintiffs confirmed that their signatures appear on the Delivery Sheet although they had no clear recollection of signing it. Plaintiffs ask the Court to enforce the Lease and exclude consideration of the Delivery Sheet because the Lease includes an integration clause. Pl.Ex. 1, ¶ H. Upon careful consideration of the record, the Court finds that the integration clause contained in the lease was not in effect.

The general rule is that where a person of mature years and who can read and

them. It appears to the Court that the parties negotiated a lower down payment, defendant then processed the $3,000 payment through plaintiffs' credit cards but did not make a corresponding change to the lease to reflect this alteration. Perhaps this was oversight or error. Defendant did not, however, argue that it was not liable under 15 U.S.C.

§ 1640(c). Section 1640(c) provides in part that a creditor or assignee may not be held liable under the CLA if he shows by a preponderance of evidence that the violation was unintentional and resulted from a bona fide error despite the existence of procedures to avoid such error.

write, signs or accepts a formal written contract affecting his pecuniary interests, it is that person's duty to read it and notice of its contents will be imputed to that person if that person negligently fails to do so. . . . *Phoenix Leasing, Inc. v. Kosinski*, 47 Conn.App. 650, 654, 707 A.2d 314 (1998) (citations and quotation marks omitted). Plaintiffs introduced "no evidence of coercion, fraud or mistake." *Id.* Nor did plaintiffs claim that they did not understand the language. Indeed, the Court finds no evidence of coercion or intimidation, as plaintiffs insisted on the full return of their $3,000 down payment and retained counsel immediately after the vehicle was repossessed. The Court believes that the Dautis' age and inexperience at the time of the transaction contributed to a misunderstanding.[14] Accordingly, this Court finds that plaintiffs had a duty to read the Delivery Sheet and cannot avoid enforcement by arguing that they did not review it or receive an executed copy. *Id.* 654–55, 707 A.2d 314; Doc. # 53 at 3.

Hartford Toyota argues, and the Court agrees, that the Delivery Sheet is enforceable. Defendant contends that the unsigned Lease was not enforceable until credit approval from a lending institution was obtained. Def. Ex. 501. The condition precedent was approval of financing. In plaintiffs' selective reading of *Unfair and Deceptive Acts and Practices*, they failed to cite the following passage which clearly supports defendant's position.

> The dealer's conditioning the automobile credit sale on the assignee's financing approval can be a condition precedent to the sale. Until the financing approval is received, the sale is not made. The dealer lets the consumer use the car awaiting the resolution of the contingen-cy; the deal, however, is not consummated until the condition is met, that is, the assignee agrees to purchase the note.

*Unfair and Deceptive Acts and Practices* § 5.4.3a.5.2

Here the record demonstrates that Hartford Toyota retained title to the car in its files, and the car had temporary dealer plates. Martinez testified that its registration was not sent to the Department of Motor Vehicles because financing was never approved. Plaintiffs also agreed, under the Delivery Sheet, to insure the vehicle while their credit application was pending. Def. Ex. 501. The agreement to insure was separately acknowledged by a second set of signatures from both Hartford Toyota and the Dautis. *Id.; see Unfair and Deceptive Acts and Practices* § 5.4.3a.5.2 ("In a true condition precedent sale, the dealer retains title in the car, the dealer's plates should be on the car, and the dealer should pay for the insurance under the dealer's blanket policy.").

The monograph cited by plaintiffs continues:

> If the dealer cannot assign the note, the deal is never consummated. Then the consumer returns the dealer's vehicle to the dealer. If the consumer does not do so, then the dealer's attempt to seize the vehicle is not an Article 9 repossession because the car's title remains with the dealer.

*Unfair and Deceptive Acts and Practices* § 5.4.3a.5.2. While this Court does not accord any special significance to *Unfair and Deceptive Acts and Practices*, despite the enthusiasm with which plaintiffs cite it, the treatise does support defendant's case on the breach of contract claim and plaintiffs

---

**14.** Plaintiffs were twenty and twenty-one at the time of the transaction. They testified this was the first time they had leased a car and they were very excited. The Court also notes that plaintiffs' inexperience with English may have contributed to a misunderstanding.

cited no other authority or case law to the contrary. The Court finds based on the evidence, that the Delivery Sheet was enforceable and there was no contract to lease because the condition precedent was not satisfied. Accordingly, the Court rules in favor of defendant on the breach of contract claim.

### 3. *Fraud*

Plaintiffs contend that defendant fraudulently induced them "to accept delivery of the vehicle in a manner so that the Plaintiffs would be bound, but not Hartford Toyota. They relied upon that statement to their detriment, and Hartford Toyota should be liable for its fraud." [Doc. # 53 at 5]. Specifically, plaintiffs contend that "they were informed that their credit had been approved and that the vehicle was theirs." *Id.*

As previously stated, the Court credits Martinez' testimony that he did not tell plaintiffs they were approved and that he reviewed the contents of the Delivery Sheet with them. The Court finds that plaintiffs signed the Delivery Sheet and they are bound by it. On this record, the Court rules in favor of defendant on the fraud claim.

### 4. *Connecticut Unfair Trade Practices Act*

In their post-trial memorandum, plaintiffs argue that "Hartford Toyota violated multiple statutes concerning the sale or lease of motor vehicles ... and violations of these laws constitute *per se* unfair trade practices...." [Doc. # 53 at 5].

Defendant persuasively countered that, if plaintiffs returned the car on April 15 as requested, there might not have been any negotiation for payment for their use of the vehicle. Defendant argues that plaintiffs' behavior was unfair and that they benefitted from free use of the vehicle for 25 days. The Court does not find it unfair or deceptive for defendant to have

sought compensation for the use of the vehicle when plaintiffs drove it over 1,000 miles. Defendant also had to repossess the vehicle. The Court credits McAllister's testimony that the Dautis' car was the only spot delivered vehicle he has repossessed since 1984. It is undisputed that plaintiffs were refunded their money in full on May 7, 1999.

The Court has not found that defendant violated the CLA or breached the contract. While retention of a buyer's down payment might be a CUTPA violation under other circumstances, the Court cannot find a violation on this record, and rules in favor of defendant on the CUTPA claim.

### *CONCLUSION*

Based on the foregoing, the Court finds in favor of defendant on all counts.

This is not a recommended ruling. The parties consented to proceed before a United States Magistrate Judge [Doc. # 43] on September 28, 2001, with appeal to the Court of Appeals.

Judgment shall enter in favor of defendant on all counts.

SO ORDERED at Bridgeport this 3rd day of June 2002.